# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALMA FELIX, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-10286-PAC |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |
| CHEW KING TAN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-08413-PAC |
| GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY, | |
| Defendants. | |
| TRAVIS FLORIO, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-08618-PAC |
| GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY, | |
| Defendants. | |

MICHAEL MERSON, Individually and on
Behalf of All Others Similarly Situated,

                   Plaintiff,

        v.

GOLDMAN SACHS GROUP INC. AND
MORGAN STANLEY,

                  Defendants.

Case No. 1:21-cv-08752-PAC

---

MARK ULANCH, Individually and on Behalf
of All Others Similarly Situated,

                   Plaintiff,

        v.

GOLDMAN SACHS GROUP INC. AND
MORGAN STANLEY,

                  Defendants.

Case No. 1:21-cv-08897-PAC

---

ALISON SCULLY, Individually and on Behalf
of All Others Similarly Situated,

                   Plaintiff,

        v.

GOLDMAN SACHS GROUP INC. AND
MORGAN STANLEY,

                  Defendants.

Case No. 1:21-cv-10791-PAC

KEVIN LEE, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,

      v.

GOLDMAN SACHS GROUP INC. AND
MORGAN STANLEY,

                Defendants.

Case No. 1:22-cv-00169-PAC

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE AMENDED CLASS ACTION COMPLAINTS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

I.      SECTION 10(B): DEFENDANTS BREACHED DUTIES OF CONFIDENCE OWED
        TO ARCHEGOS AND THE ISSUERS BY TRADING PROPRIETARY SHARES AND
        TIPPING PREFERRED CLIENTS ................................................................................. 5

        A.      Defendants Breached Duties of Confidence Owed to Archegos ........................... 6

                1.      Defendants' Agreed to Keep Confidential, and Had a Pattern and Practice
                        of Keeping Confidential, MNPI Received from Archegos ........................ 6

                2.      Defendants Breached Duties of Confidence to Archegos by Selling Their
                        Own Proprietary Shares and Tipping Preferred Hedge Fund Clients on the
                        Basis of MNPI Misappropriated from Archegos .................................... 11

        B.      Defendants Also Breached Duties of Confidence Owed to the Issuers and Their
                Shareholders Derivatively Through Archegos ...................................................... 17

II.     PLAINTIFFS ADEQUATELY PLEAD A STRONG INFERENCE OF SCIENTER .... 19

III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ...................................... 22

IV.     SECTION 20A: PLAINTIFFS IN *FELIX* AND *SCULLY* BOTH PLEAD
        CONTEMPORANEOUS TRADING ............................................................................ 24

V.      SECTION 20(A): DEFENDANTS HAD THE POWER TO CONTROL PRIMARY
        VIOLATOR EMPLOYEES ......................................................................................... 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Standard, Inc. v. Crane Co.*,
    510 F.2d 1043 (2d Cir. 1974)..................................................................................................17

*Brass v. Am. Film Techs., Inc.*,
    987 F.2d 142 (2d Cir. 1993)....................................................................................................14

*Capasso v. CIGNA Ins. Co.*,
    765 F. Supp. 839 (S.D.N.Y. 1991) .........................................................................................19

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
    No. 17 Civ. 0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ...............................23

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006).....................................................................................25

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    562 F. Supp. 2d 511 (S.D.N.Y. 2008).....................................................................................17

*Dirks v. SEC*,
    463 U.S. 646 (1983).................................................................................................................17

*Donoghue v. Bulldog Invs. Gen. P'ship*,
    696 F.3d 170 (2d Cir. 2012)....................................................................................................17

*Dresner v. Utility.com, Inc.*,
    371 F. Supp. 2d 476 (S.D.N.Y. 2005).....................................................................................14

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc*,
    343 F.3d 189 (2d Cir. 2003)...............................................................................................23, 24

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................................11, 15

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................................15

*Gordon v. Sonar Cap. Mgmt. LLC*,
    962 F. Supp. 2d 525 (S.D.N.Y. 2015).....................................................................................22

*Gruber v. Gilbertson*,
    No. 16-cv-9727 (JSR), 2022 WL 4232834 (S.D.N.Y. Sept. 14, 2022) ...................................23

*Gruber v. Gilbertson*,
No. 16cv9727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ..........................................18, 24

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
286 F.3d 613 (2d Cir. 2002)................................................................................................18

*In re Aegean Marine Petroleum Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)..................................................................................22

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)..................................................................................25

*Kasilingam v. Tilray, Inc.*,
No. 20-cv-03459 (PAC), 2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022)....................19, 20, 21

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
173 F. Supp. 2d 129 (S.D.N.Y. 2001)..................................................................................11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).................................................................................................22

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*,
930 F. Supp. 2d 532 (S.D.N.Y. 2013)..................................................................................14

*N.Y. Indep. Contractors All., Inc. v. Consol. Edison Co.*,
No. 16 CV 01172 (KMW), 2017 WL 779600 (S.D.N.Y. Feb. 27, 2017) ..............................11

*Puddu v. 6D Glob. Techs., Inc.*,
No. 15-cv-8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021)............................18, 19

*SEC v. Afriyie*,
No. 16-cv-2777 (JSR), 2018 WL 6991097 (S.D.N.Y. Nov. 26, 2018) ..................................11

*SEC v. Cuban*,
620 F.3d 551 (5th Cir. 2010) ...............................................................................................17

*SEC v. Dorozhko*,
574 F.3d 42 (2d Cir. 2009)....................................................................................................7

*SEC v. Kornman*,
391 F. Supp. 2d 477 (N.D. Tex. 2005) ...............................................................................8, 9

*SEC v. McCaskey*,
No. 98CIV6153SWKAJP, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002)...............................25

*SEC v. McGee*,
895 F. Supp. 2d 669 (E.D. Pa. 2012) ....................................................................................7

*SEC v. Musella*,
    578 F. Supp. 425(S.D.N.Y. 1984) ........................................................19

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012).................................................... *passim*

*SEC v. Singer*,
    786 F. Supp. 1158 (S.D.N.Y. 1992)..................................................9, 16

*SEC v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011)....................................................18

*SEC v. Yun*,
    327 F.3d 1263 (11th Cir. 2003) ........................................................7, 8

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)...............................................22, 23

*Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*,
    186 F.3d 157 (2d Cir. 1999)..............................................................10

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991).................................................................8

*United States v. Falcone*,
    257 F.3d 226 (2d Cir. 2001).................................................................7

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020)..............................................................8, 9

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002)................................................................15

*United.States v. Carpenter*,
    791 F.2d 1024, 1029 (2d Cir. 1986).....................................................18

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015)..........................................6, 7, 8, 10

## Statutes & Other Authorities

15 U.S.C. §78t-1 .........................................................................24

17 C.F.R. §230.405 ......................................................................25

17 C.F.R. §240.10b5-1(a) .............................................................6, 7

17 C.F.R. §240.10b5-2(b) ...............................................................7

17 C.F.R. § 240.13d–3(b) ............................................................................................17

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the*
    *Federal Securities Laws*, 93 HARV. L. REV. 322 (1999) ........................................18

## **INTRODUCTION**

Plaintiffs bring insider trading claims under §§10(b), 20A and 20(a) of the Securities Exchange Act against Defendants Morgan Stanley and Goldman Sachs, who front-ran trades and tipped favored hedge fund clients to do the same over the weeks and months before their client, Archegos Capital Management ("Archegos"), collapsed.  Defendants do not dispute that while in possession of material non-public information ("MNPI") received from Archegos, they sold off massive amounts of their own proprietary securities, and thereby avoided billions of dollars in losses.  They served as prime brokers, margin lenders, swap partners and block traders for Archegos, a family office that, with Defendants assistance, had built up large, highly leveraged positions in the stock of several companies (the "Issuers").  Neither the Issuers nor the market were aware of Archegos's large, confidential positions, and Archegos had further entered into certain swap transactions with Defendants designed to hide those positions from the public.  Over the course of 1Q 2021, Archegos came under increasing stress and escalating margin calls from Defendants and its other prime brokers, before collapsing in late March 2021.  Defendants knew that Archegos's collapse would cause catastrophic drops in the price of the Issuers' stocks because Archegos's positions were extraordinarily large – ranging from 30% to 70% – of the Issuers' outstanding float.  Based on this MNPI, Defendants rapidly unloaded between 80% to 90% of their ***proprietary*** shares of the Issuers stock, in breach of their duty of confidentiality.  More specifically, Defendants sold their proprietary shares in late March 2021 before Archegos liquidated its own large holdings of the Issuers' stock – which only Archegos's prime brokers knew was about to happen – and therefore sold before the value of their proprietary shares was set to significantly drop owing to that liquidation, thereby avoiding massive losses that were passed on to the Class.

Defendants' primary argument on their Motion to Dismiss (ECF No. 40 ("MTD"), Case No. 21-cv-10791-PAC), that they did not breach any duty of confidence when selling their

proprietary shares of the Issuers' stock, is baseless.  In truth, Defendants confirmed that the MNPI they received from Archegos was confidential, stated as much in meetings they attended with Archegos and its other prime brokers, such that they could not even discuss that MNPI with Archegos's other brokers, and prior to the relevant period had a practice of keeping that MNPI confidential.  This duty of confidentiality was in accordance with industry norms, and Archegos's other prime brokers acknowledged it as well during the foregoing meetings.  The principal role of a prime broker is to be entrusted with its client's MNPI and confidentially execute transactions on behalf of the client.  As an example, rather than attempt to execute large market-moving transactions in public markets, which would subject the transactions to front-running or yield poor prices because opposing traders would know the market was being saturated with a large transaction, Archegos paid Defendants considerable fees to execute such transactions through non-public block trades that yielded better prices precisely because Defendants negotiated their terms privately.  If Defendants were to front-run these block trades, and trade their proprietary shares based on the confidential MNPI that the block trades were about to occur, it would negatively impact the price of the block trade and defeat their purpose.  Thus when Archegos was collapsing in March 2021, its other prime brokers, in accordance with the duty of confidentiality and unlike Defendants, did not sell their proprietary shares of the Issuers' stock, even though that subjected them to huge losses.

Moreover, Defendants' *proprietary* holdings of the Issuers' stock were not covered by any contract with Archegos, but were independent purchases that Defendants made for their own profit. They are entirely distinct from a smaller set of *Archegos's* shares of the Issuers' stock that Archegos had pledged as *collateral* for payments it owed Defendants pursuant to certain contracts. Whatever contractual right Defendants may have had to specifically sell *Archegos's collateral* in

an event of default therefore did not permit Defendants to sell their own *proprietary shares* based on confidential MNPI.  Indeed, Defendants' proprietary sales undermined Archegos, since they drove down the price of the Issuers' stock, and thereby worsened its liquidity crisis.  Given that Defendants acknowledged the MNPI was confidential, and engaged in deliberate front-running with their proprietary shares to beat Archegos's liquidation, which they had no right to do so as the conduct of the other prime brokers confirms, Defendants acted with scienter.  Likewise, since Defendants sold shares to the Class to avoid the significant drop in value that was about to occur when the risks concealed by confidential MNPI materialized – the liquidation of Archegos's large positions – loss causation is adequately alleged.  The MTD should accordingly be denied.

## BACKGROUND

**Defendants' Confidential Prime Brokerage Services to Archegos:** Defendants' prime brokerage, and related margin lending, swap and block trading, services required the receipt of Archegos's sensitive MNPI, and their treating that MNPI with trust and confidence.  *See* ¶¶106-36, 150-208.[1]  Doing so was critical to serving Archegos's interests, given that the large transactions Archegos engaged in would be negatively impacted if they were revealed publicly, and the stigma of transacting with Archegos's founder, Bill Hwang, who had recently suffered numerous sanctions for securities fraud.  ¶¶25-35, 90-112.  Thus Defendants acknowledged their duty to maintain the confidentiality of Archegos's MNPI across documented calls and other communications with Archegos and its other prime brokers.  ¶¶119, 165-71.  Industry standards and Defendants' own policies and practices recognize the confidentiality necessitated in providing Archegos prime brokerage services.  ¶¶111-12, 137, 272, 285, 293.  For that reason, during the

---

[1]       For convenience, all citations to "¶__" are to the Amended Complaint from *Scully v. Goldman Sachs, et al.*, Case No. 21-cv-10791-PAC (filed June 13, 2022), ECF No. 39.  Also, unless otherwise noted, all emphasis is added and quotations omitted.

calls with Archegos's other prime brokers, they acknowledged the duty to keep the MNPI the received from Archegos confidential as well.  ¶¶199-203, 229-31.

 With Defendants' assistance, Archegos built up large beneficial ownership positions in the Issuers' stock, that grew to be well in excess of the 5% disclosure threshold mandated by Exchange Act §13(d), and therefore should have been – but were not – publicly disclosed.  ¶¶119-36.  As such, though Defendants were aware of those large positions by providing confidential margin loans and block trades, and through confidential representations that Archegos made to them, the Issuers and the market were not.  *Id.*  Further, Defendants acted as counterparties to Archegos on confidential total return swaps ("TRS") referenced to the Issuers' stocks, which were synthetic instruments designed to increase Archegos's beneficial ownership of and exposure to those stocks without requiring the purchase of those stock, and which were designed to help Archegos try to avoid its disclosure requirements. *See* ¶¶12, 56-60, 104, 112, 267-68.  Archegos pledged its own assets, including some of its holdings of the Issuers' stock, as collateral for certain payments it owed Defendants, pursuant to its contracts with them.  ¶¶44-60.

 **Defendants' Distinct Proprietary Hedged Holdings:** Separate and apart from the confidential prime brokerage, margin lending, TRS and block trading services and agreements provided to Archegos, Defendants purchased for their own proprietary accounts millions of Issuer shares as an attempt to protect their desired profit margins on the service fee they were paid to provide TRS.  *See* ¶¶4, 8, 16, 110-11, 185, 289, 296-308, 311.  Defendants' proprietary holdings were not part of any contract or requirement with Archegos, and were not collateral provided by or on services for Archegos, but were purchased voluntarily by Defendants to serve their own financial engineering ends.  ¶¶16, 185, 297-307.  Moreover, Defendants had means of hedging their desired profit margins that did not involve proprietary purchases of the Issuers' shares.

¶¶106-12.

**Defendants Front-Run Archegos's Collapse:**  Over the course of 1Q 2021, Archegos's holdings were losing value and it was facing escalating margin calls from its prime brokers, such that by its late March 2021 collapse Archegos's posted capital was *less than $10 billion*, while its aggregate *exposure had ballooned to $120 billion*.  *See* ¶¶119-44.  Further, during that time, numerous "red flags relating to the size, concentration, and liquidity of Archegos's portfolio" were already apparent to Defendants and it other prime brokers.  *See* ¶¶137-49, 151-89, 226-31 (citing *Report on Archegos Capital Management* prepared by Credit Suisse).  By the week of March 22, 2021, Archegos's ability to cover those margin calls was all but exhausted.  *See* ¶¶186-97.  Archegos thus convened a series of calls with Defendants and its other prime brokers, to delay their declaring events of default, and negotiate a managed liquidation of its posted collateral that would result in better prices for all involved.  *See* ¶¶198-208.  Although Defendants acknowledged their existing duty of confidentiality regarding MNPI they received from Archegos (and its other prime brokers) on those calls, in actuality Defendants were breaching that duty, by, unlike the other prime brokers, rapidly unloading between 80% to 90% of their proprietary holdings in the Issuers' stocks, mainly in that short late-March 2021 period before Archegos's liquidation occurred.  ¶¶296-307.  Defendants compounded that by tipping their preferred hedge fund clients to do the same, and they are now under multiple investigations for that practice.  ¶¶70-89, 243-66.  Through this insider trading and tipping, Defendants avoided billions in losses, which were passed on to the Class and the prime brokers who honored their duties.  ¶¶296-307.

## ARGUMENT

I.    **SECTION 10(B): DEFENDANTS BREACHED DUTIES OF CONFIDENCE OWED TO ARCHEGOS AND THE ISSUERS BY TRADING PROPRIETARY SHARES AND TIPPING PREFERRED CLIENTS**

Section 10(b) prohibits "the purchase or sale of a security of any issuer, on the basis of

**material nonpublic information** about that security or issuer, **in breach of a duty of trust or confidence** that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information." 17 C.F.R. §240.10b5-1(a).  Insider trading claims manifest in two primary theories. *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).  One "grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence" and who breach a duty owed "**to the source of the information**," whoever that source happens to be.  *Id*.  The second theory is grounded in "the duty of trust and confidence insiders **owe to shareholders**."  *Id*.  Both also "reach situations where the insider or misappropriator tips another who trades on the information," such that the tippee takes on the duty derivatively.  *Id*. at 285.  For both, once "in receipt of material non-public information," the party takes on "**a duty to abstain from trading or to disclose the information publicly**." *Id*. at 284. Defendants are liable under both theories.

### A.    Defendants Breached Duties of Confidence Owed to Archegos

Defendants do not dispute that they received MNPI from Archegos and traded proprietary shares on that MNPI, two of the three elements of a misappropriation claim.  *See* MTD at 9-16; *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015).  Their arguments on the third element – breach of a duty of confidence – fail.

### 1.    Defendants' Agreed to Keep Confidential, and Had a Pattern and Practice of Keeping Confidential, MNPI Received from Archegos

The SEC has prescribed that the "duty of trust or confidence" that triggers insider trading liability under §10(b) "exists in the following circumstances":

(1)    Whenever a person agrees to maintain information in confidence; [or]

(2)    Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing

confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.

17 C.F.R. §240.10b5-2(b).

Under these standards, courts have held Defendant Morgan Stanley owed a duty of confidence under substantially similar circumstances involving an investor that held large positions in a company's stock and was responding to margin calls and a liquidity crisis by arranging meetings with the relevant parties to forestall an event of default and restructure its obligations. *Veleron*, 117 F. Supp. 3d at 419. There, Judge McMahon found that the investor had a reasonable expectation that Morgan Stanley would keep the foregoing MNPI confidential based on its "internal policies" and on standard "practices" followed by the firms in the "financial services industry," as well as on statements that Morgan Stanley made at the foregoing meetings that the information at issue was "confidential." *Id*. at 442-43. *Veleron* held that Morgan Stanley owed a duty of confidence based on its pattern and practice of treating such MNPI confidential, even though it had no express agreement to do so, and numerous other cases have reached the same result. *E.g.*, *id*. at 437-37, 441, 447; *United States v. Falcone*, 257 F.3d 226, 234–35 (2d Cir. 2001); *SEC v. Yun*, 327 F.3d 1263, 1274 (11th Cir. 2003); *SEC v. McGee,* 895 F. Supp. 2d 669, 682 (E.D. Pa. 2012). As such, *Veleron* confirmed that financial services providers like Defendants can take on a duty of confidence even where they are not fiduciaries, as the SEC and many cases have confirmed as well. 117 F. Supp. 3d at 436-37; 17 C.F.R. §240.10b5-1(a), 2(b); *SEC v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009). Judge McMahon concluded that even though Morgan Stanley had the right to sell the stock of a particular company that the investor in *Veleron* had pledged as collateral for certain payments it owed its counterparties, that did not give Morgan Stanley the right to sell its proprietary shares of that stock, which Morgan Stanley had voluntarily purchased to hedge its position as a counterparty on a related swap – there too, Morgan Stanley

was the only counterparty who breached its duty of confidence by selling its proprietary shares based on MNPI. 117 F. Supp. 3d at 420-22.

As in the foregoing cases, the allegations here plead that Defendants owed Archegos a duty of confidence. This duty was essential to serving as Archegos's prime broker, margin lender, swap partner, and block trader. *See* ¶¶90-101, 106-12. Prime brokerages exist primarily to service large investors like Archegos, who pay a premium for confidentiality and expertise so the brokers can undertake large, market-moving transactions on the most favorable terms for the investors through block trades and similar discrete transactions. ¶¶44-69. Had Archegos attempted to execute large volume trades independently on the open market, the trades themselves could negatively impact the stock price or be easily susceptible to front running. ¶¶44-69. Likewise, confidentiality was essential to Defendants serving as counterparties for Archegos's TRS, which afford the ability to acquire large, non-public exposure to and indirect beneficial ownership of publicly listed stocks without directly purchasing the underlying stocks themselves. ¶¶106-12. Archegos resorted to TRS with Defendants, who knew of Archegos's substantial direct holdings in those underlying Issuer stocks, to hide its massive exposure from the Issuers and the market in an attempt to circumvent requirements that it publicly report its ownership interest. ¶¶104-12. A duty of confidence existed because Defendants, "in whom confidence [was] reposed ha[d] entered into a relationship in which [they] act[ed] to serve the interests of [Archegos] entrusting [them] with such information." *See, e.g., United States v. Kosinski*, 976 F.3d 135, 150-52 (2d Cir. 2020).

The "very nature of the services" provided also demonstrates that Defendants agreed to keep confidential the information they received from Archegos, including its transactions in and exposure to the Issuers' stock. *SEC v. Kornman*, 391 F. Supp. 2d 477, 489 (N.D. Tex. 2005) (citing *United States v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991)); *Yun*, 327 F.3d at 1274. Those

services "necessarily entailed the sharing of confidential information and the consequent need to protect confidential information received from clients" in order to achieve Archegos's objectives, which courts have long recognized creates "a reasonable inference" of a duty of confidence. Further, Defendants operated with "a measure of *superiority and influence*" in determining block trades and other sensitive services for Archegos, precisely owing to their supposed expertise, discretion, and fidelity.  *SEC v. Singer*, 786 F. Supp. 1158, 1170 (S.D.N.Y. 1992).

Defendants acknowledged they were being entrusted with confidential MNPI to perform these sensitive services for Archegos.  For example, Archegos had to "represent, in connection with any trade" Defendants undertook on its behalf that it did not hold an aggregate beneficial ownership in the stock across all of its prime brokers beyond certain percentages.  *See* ¶¶176-85. These aggregate representations from Archegos would have been unnecessary if Defendants could simply contact its other prime brokers to find out what positions Archegos held through them.  But neither Defendants, nor the other prime brokers, did so, because all understood that such MNPI from Archegos was subject to duties of confidence.  Defendants' "sophistication," as two of the leading financial firms in the world, underscores that they knew this MNPI from Archegos was entrusted in confidence.  *See, e.g., Kosinski*, 976 F.3d at 146; *Kornman*, 391 F. Supp. 2d at 489.

As in *Veleron*, Defendants attended meetings with Archegos and its other counterparties during which all confirmed their duty to keep the MNPI received from Archegos (and its other prime brokers) confidential.  *Supra* at 7.  At these meetings, which took place in late March 2021 ahead of Archegos's collapse, internal counsel from Defendants and the other prime brokers specifically noted their long-standing agreements to maintain Archegos's securities positions involving their prime brokerage, TRS, and block trading services in strict confidence.  ¶¶198-208. Counsel for Defendants and the other prime brokers also confirmed that "on any calls between

[those] brokers," lawyers were required to read a script reiterating their existing duties of confidence with Archegos to "*mak[e] clear that no broker was permitted to disclose its Archegos-related positions*."  ¶¶202, 229.  At these and prior meetings, Archegos emphasized to Defendants the need to "*not tip the market*" to its confidential MNPI.  ¶¶188-97, 308.

Defendants' agreement to keep Archegos's MNPI confidential is also reflected in their "own corporate policies and practices."  ¶¶285, 293.  *Veleron* is instructive, as that case found evidence that Morgan Stanley, in providing services on a swap similar to those at issue here, had a policy and practice of maintaining MNPI like that provided by Archegos here in confidence.  *See* 117 F. Supp. 3d at 442-43.  A series of lawsuits brought after the events and government investigations here by other clients of Defendants' prime brokerage services also assert that per express agreements with Defendants, Defendants' policies and well-settled industry norms, Defendants owe a duty of confidentiality to keep the MNPI at issue here confidential.  ¶¶83-84. Over the years of prime brokerage and related services that Defendants provided Archegos before and into 1Q 2021, Defendants abided by these agreements in regular (often daily) communications with Archegos regarding its holdings, trades and positions.  ¶¶119, 165-68, 169-71.

That prime brokerage and related services necessarily entail confidentiality is also apparent from the conduct of Archegos's other prime brokers.  Each of them, in stark contrast to Defendants' opportunistic front-running and client tipping, honored their duties to Archegos, kept similar MNPI in strict confidence, and accordingly abstained from trading in the Issuers' shares while in possession of that MNPI – even though it led to massive losses.  ¶¶106-12, 150-85; *see Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.,* 186 F.3d 157, 172 (2d Cir. 1999).

The foregoing allegations plead Defendants' agreement to keep Archegos's MNPI confidential, and also plead Defendants' longstanding pattern and practice of keeping that MNPI

confidential, either of which establishes the requisite duty of confidentiality. Nothing more is required under Rule 9(b) or otherwise to plead such a duty. *SEC v. Afriyie*, No. 16-cv-2777 (JSR), 2018 WL 6991097, at *2 (S.D.N.Y. Nov. 26, 2018), *aff'd*, 788 F. App'x 59 (2d Cir. 2019); *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 136–37 (S.D.N.Y. 2001).[2]

> ## 2.   Defendants Breached Duties of Confidence to Archegos by Selling Their Own Proprietary Shares and Tipping Preferred Hedge Fund Clients on the Basis of MNPI Misappropriated from Archegos

Defendants do not dispute that, armed with MNPI regarding Archegos's massive positions in the Issuers' stock and its liquidity crisis, they sold the vast majority of their proprietary shares of those stock, and thereby saved billions of dollars in losses (MTD at 9-16) – which losses were transferred to the Class when the MNPI and its risk materialized. Instead, Defendants make the baseless claim that this was not a breach of their duty, because they somehow had a contractual right to engage in a fire-sale of their proprietary shares of the Issuers' stock, even though their proprietary shares were not covered by any contract with Archegos. In addition, Defendants barely address the well-pled allegation that they engaged in a separate breach of their duty of confidence by tipping hedge fund clients to sell their own shares of the Issuers' stock based on the MNPI, when those clients' shares clearly were not covered by any contract with Archegos either.

*First*, the Defendants' **proprietary shares of the Issuers stock** were not covered by or part of any contracts with Archegos for TRS, or for any other services. ¶¶4, 8, 16, 110-11, 185, 289, 296-308, 311. Those proprietary shares were not collateral for the TRS, or margin lending, or any

---

[2]       Defendants' citations demanding exceeding specificity are inapposite and turn on rules unique to antitrust and breach of contract claims. MTD at 13-14. Unlike here, *New York Independent Contractors Alliance, Inc. v. Consolidated Edison Co.*, involved a supposed antitrust conspiracy, for which "substantive antitrust law limits the range of permissible inferences," which required plaintiffs to plead "more persuasive evidence to support their claim than would otherwise be necessary," *i.e.*, that "tends to exclude" the possibility of "other, equally plausible explanations." No. 16 CV 01172 (KMW), 2017 WL 773600, at *3-4 (S.D.N.Y. Feb. 27, 2017). Plaintiffs need not plead evidence, much less tending to "exclude" non-conspiracy alternatives. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).

services Defendants provided; nor were they pledged to cover any obligation of Archegos or losses by Defendants pursuant to the TRS or any other contract between Archegos and Defendants. *Id*. Archegos paid Defendants a considerable service fee to compensate them for entering into TRS and for any associated risk thereon. ¶¶44-47. Nor were Defendants required or even supposed to purchase those proprietary shares in connection with the TRS or any contract or service they provided to Archegos. ¶¶106-12. Rather, Defendants voluntarily chose to purchase those proprietary shares as an independent hedge for their own profit. ¶¶4, 8, 16, 110-11, 185, 289, 296-97. A TRS is a synthetic instrument tied to the value of a reference security, so by purchasing hedged shares of the reference security, theoretically, any increase in their value would offset the payment that Defendants owed Archegos under the TRS, and any decrease in their value would be offset by the payment Archegos owed Defendants under the TRS, and this financial engineering would enable Defendants to keep the entire service fee irrespective of how the TRS played out. ¶¶56-60. For a hedging strategy on their TRS service fee, Defendants had many other options that did not involve purchasing proprietary shares of the reference securities, such as taking counterbalancing swap positions with other clients, buying any of the multitude of countervailing derivative positions available, or buying index funds that correlated with the reference securities. ¶¶110-11.

As such, Defendants' proprietary shares stand apart from and in contrast to the ***stock Archegos owned and pledged as collateral*** for margin loans, swaps and other services received from Defendants. For example, when Archegos borrowed money from Defendants to purchase securities, or owed periodic payments to Defendants on a TRS if the value of that swap decreased, Archegos was obligated to pledge its own securities, cash or other assets as collateral. It was this collateral pledged by Archegos that was subject to increases over time through margin calls and

thus that protected Defendants against the risk of losing their own capital.  Defendants also protected against that risk by determining how much capital to loan on specific transactions and setting the interest rate Archegos had to pay.  Archegos's pledged collateral thus served different functions than Defendants' proprietary shares: if the value of an asset decreased, and Archegos purchased or owed part of that stock or swap on margin, its pledged collateral would protect Defendants' loss; but Defendants' separate, proprietary shares of the underlying Issuers protected their own profit, such that a decrease in the value would put their own capital, invested in their proprietary shares, at risk.

In turn, as Defendants note, the contractual remedy if Archegos failed to meet its obligations under a margin contract was for Defendants to declare an "event of default," which only "entitle[d] the lender to sell the securities ***pledged as collateral*** for the loan" – that is, to sell Archegos's pledged assets.  MTD at 5; *see* ¶¶52-60, 199-208.  Likewise, the contractual remedy for Archegos's "failure to post margin" on a TRS was for Defendants to declare this a "default," which "entitle[d] the counterparty to terminate the swap," so that Defendants could stop performing their obligations under the TRS and sell off any collateral pledged by Archegos.  MTD at 5; *see* ¶¶52-60, 199-208.  Defendants could also bring suit against Archegos for any unpaid debts, and to adjudicate claims in bankruptcy proceedings if need be.  But, as in *Veleron*, none of Defendants "contractual remedies" reach the independent hedged shares bought for Defendants' own proprietary accounts separate and apart from any contract with Archegos, much less entitled Defendants to sell those distinct proprietary shares based on confidential MNPI.  ¶¶16, 185, 297-307; *supra* at 7.   Even where a party has a contractual right to take one act, like selling shares pledged by Archegos as collateral, that does not give them the right to take a completely separate

act, like Defendants selling distinct, proprietary shares.[3]   By rapidly selling-off substantial proprietary holdings of Issuers' stock, Defendants drove down those share prices, which harmed Archegos.  For Archegos's remaining assets consisted in large part of shares of the Issuers' stock or swaps tied to them, and the decreased share prices left Archegos with even less liquidity to cover debts.  ¶¶186-203.

Defendants fail to cite any factual support for their purported right to sell-off proprietary hedged shares.  *See* MTD at 11-14.  Their one feint rests on a blatant mischaracterization of a single allegation from the Complaint and is baseless.  *Id.* at 11.  Defendants quote the following passage from ¶173, "'if Archegos's position decreased in value by a certain amount the underlying stocks would have to be sold ***in order for Archegos to pay the Counterparties what they were owed under the swap agreements***,'" which, as the plain language and broader passage make clear, concerns selling Archegos's stock pledged as collateral to pay counterparties, not selling Defendants' distinct stock purchased as an independent hedge.  *Id.*  The very next sentence of ¶173 discusses eventualities "[s]hould ***Archegos's positions*** be illiquid" which would make it difficult for Archegos to "sell the shares," and the subsequent paragraphs along with this entire section of the Complaint involve discussions whereby Defendants "asked Archegos to provide them with information regarding ***its overall portfolio liquidity.***"[4]  ¶¶172-75.  The Complaint of course alleges, as a description of what transpired, that as Defendants were planning to sell Archegos's pledged

---

[3]      *See Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 541–42 (S.D.N.Y. 2013) (although Customer Agreement authorized Morgan Stanley to "liquidat[e] an account and sell[] it to an affiliate" that did not extend to the "self-dealing" and "conflict of interest" that attended ultimate liquidation); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 149 (2d Cir. 1993) ("warrants contract" gave plaintiffs right "to purchase 32,500 shares" of company's restricted common stock, but not did imply the distinct right to purchase its "unrestricted common stock").

[4]      Even if this allegation could be contorted as Defendants attempt (it cannot) to permit some sort of sale by Defendants of shares not subject to the contract, under Exchange Act §29(a) they still could not contract around the securities laws and had to disclose the MNPI beforehand or abstain from trading.  *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 490 (S.D.N.Y. 2005).

collateral and to unwind the TRS, they sold their proprietary shares of the Issuers' stock, but nothing in the Complaint suggests that those proprietary sales were part of a permissible contractual remedy – it repeatedly alleges the exact opposite, that those were extra-contractual sales based on MNPI that breached Defendants' duty of confidence. ¶¶8, 16, 185, 289, 296-308, 311.

Nor do any of the cases Defendants cite authorize the sale of extra-contractual proprietary shares per a contractual remedy. *See* MTD at 12, 14. Most do not even involve insider trading, and are otherwise factually distinguishable. *Supra* n.2. Many involve when a fiduciary duty arises, which is inconsequential because, as set forth above (*supra* at 7) the claims here require a duty of confidence, not any "general fiduciary duty." Still, it remains that "a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker," and for the reasons discussed above Defendants had such a duty here. *See United States v. Szur,* 289 F.3d 200, 211 (2d Cir. 2002).[5]

Given Defendants owed duties of confidence and had no "contractual" right to sell proprietary shares, Archegos had no reason to expect Defendants would breach their duties and exploit MNPI for personal benefit. The March 2021 forbearance meetings were about delaying triggering events of default and contractual remedies that would enable Defendants to sell Issuer shares that **Archegos owned and had pledged as collateral**, which if done rapidly and **en masse** could drive down share prices, exacerbate Archegos's losses, and make it even harder for Archegos to repay debts. ¶¶198-208. Nor did the meeting between the *Veleron* investor and Morgan Stanley create an expectation that Morgan Stanley would sell its proprietary hedged shares based on

---

[5] The existence of contractual terms that might excuse Defendants' front-running is, at best, an "affirmative defense that must be pled and proved" by Defendants; it cannot be presumed at the pleading stage. *See Freudenberg*, 712 F. Supp. 2d at 200-01; *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 n.14 (S.D.N.Y. 2011).

confidential MNPI.  *Supra* at 7.  Nothing in the March 2021 meetings gave Defendants license to sell proprietary shares based on confidential MNPI, which would only have harmed Archegos further and was a right that Defendants never bargained for.  ¶¶198-208, 282-307.

Defendants' claim that they "disclose[d] their intent to trade" fails for the same reasons (MTD at 15) – they at most disclosed their intent to exercise contractual remedies and sell shares Archegos had pledged as collateral, not to sell their own, distinct proprietary shares.  ¶¶198-208. In sum, Defendants' cannot conflate a small subset of Issuer shares that ***Archegos owned*** and pledged as collateral, with the distinct proprietary shares ***Defendants owned*** outside of any contract with Archegos, to further their own financial engineering purposes.

***Second***, Defendants separately breached duties of confidence by tipping off hedge fund clients to sell their holdings of Issuers' shares based on Archegos's MNPI.  The shares held by third-party hedge funds were not subject to contracts between Defendants and Archegos, and thus not subject to any purported contractual remedy under those contracts.  Defendants' only response is to brush off this distinct misconduct as not adequately supported (MTD at 17-18), which simply ignores allegations detailing Defendants' reputation, pattern, and practice of tipping clients ahead of block trades, that following Archegos's collapse an array of government investigations were revealed, expanded, and accelerated, targeting Defendants' front-running and tipping, including ahead of Archegos's trades, as well as particular employees and clients implicated, that have been removed from positions, and that are subject to DOJ and SEC investigations.  ¶¶5, 41-42, 70-89, 261. Defendants duck these damning allegations because they plainly suffice at this stage.

Ultimately, while Defendants' claims of no duty of confidence due to their purported "contractual remedies" are substantively meritless for the reasons above, they also fail on a motion to dismiss, for they present a host of a complex factual questions that cannot be resolved here. *See,*

*e.g., Singer*, 786 F. Supp. at 1169 ("the assessment of the existence or absence of a confidential relationship invariably requires a series of factual findings" and thus "generally rests with the finder of fact, *i.e.*, the jury, at trial"); *SEC v. Cuban*, 620 F.3d 551, 558 (5th Cir. 2010) (same). Plaintiffs' detailed allegations more than suffice at this stage.

### B.      Defendants Also Breached Duties of Confidence Owed to the Issuers and Their Shareholders Derivatively Through Archegos

Independent of duties owed to Archegos, Defendants also owed duties of confidence to the Issuers and their shareholders derivatively, as tippees of Archegos.  Again, Defendants do not dispute receiving MNPI from Archegos or then trading on that MNPI.  *Obus*, 693 F.3d at 285. Instead, Defendants contend Archegos owed no duty to the Issuers. To the contrary, Archegos owed duties to the Issuers both as statutory insider and as misappropriator.  *Id.* (tippee liability "reach[es] situations where the insider *or* misappropriator tips another").

*First*, Archegos was a statutory insider of the Issuers and thus owed duties to disclose or abstain from trading on MNPI.  *See, e.g., Dirks v. SEC*, 463 U.S. 646, 653, 655 n.14 (1983). Archegos was rendered an insider by exceeding beneficial ownership thresholds set by §13(d) and §16 of the Exchange Act.  *See*, *e.g.*, *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 177 (2d Cir. 2012).  These beneficial ownership provisions "give[] issuers a legally protected fiduciary right to expect statutory insiders" – like Archegos here – "not  to engage in" illicit insider trading. *Id.* at 178; *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1060 (2d Cir. 1974).  Worse, Defendants assisted Archegos in building up these massive positions through TRS designed to duck these express statutory duties.  *See* 17 C.F.R. § 240.13d–3(b); *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 549-52 (S.D.N.Y. 2008), *aff'd in part, vacated in part by CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP,* 654 F.3d 276 (2d Cir. 2011).

**Second**, even were it not a statutory insider, Archegos was still duty-bound by §§13(d) and 16 to disclose this information to the Issuers, not secretly tip it to Defendants.  The duties imposed by §§13(d) and 16 exist precisely to "ensure that investors will be informed about purchases of large blocks of shares," as those circumstances can be exceedingly important to investors.  *See Hallwood Realty Partners, L.P. v. Gotham Partners*, *L.P.*, 286 F.3d 613, 620 (2d Cir. 2002).  Thus, failure to abstain or disclose in violation of these beneficial ownership thresholds is itself a "deceptive act" under §§10(b) and 20A: "it signal[s] falsely to investors that there was no such ownership to disclose."  *See, e.g., Gruber v. Gilbertson*, No. 16cv9727, 2018 WL 1418188, at *13 (S.D.N.Y. Mar. 20, 2018); *Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021).   Archegos breached these duties and thus misappropriated MNPI.  *See Puddu*, 2021 WL 1198566, at *6; *SEC v. Wyly*, 788 F. Supp. 2d 92, 98 (S.D.N.Y. 2011) (evading §13(d) breached duty to issuers).

Defendants argue no breach occurred because the MNPI originated with Archegos, not the Issuers.  MTD at 17.  But "distinctions premised on the source of the information undermine the prophylactic intent of the securities laws" and the duty to abstain or disclose.  *See United States v. Carpenter*, 791 F.2d 1024, 1029 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987). As a seminal article, repeatedly endorsed by the Supreme Court and the Second Circuit, elaborated:

> Neither the history nor the policy of the antifraud provisions (and certainly not their language) confines their coverage to . . . information which comes from within the corporation . . . Other kinds of information, such as market information, may also be material. . . [and] need not come from. . . 'inside' the enterprise.

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 HARV. L. REV. 322, 329-30 (1999); *United States v. O'Hagan,* 521 U.S. 642, 658 (1997). The issue is not the source of information, but whether it is "material" and "nonpublic."

Nor are Defendants correct that Archegos had no "duty not to trade or not to share information." MTD at 17. They cite a single plainly inapt case centered on divorce proceedings, which rejected the plaintiff-wife's attempt to impose a general duty to disclose on her husband based on the specific "obligation not to lie under oath in deposition or at trial." *See Capasso v. CIGNA Ins. Co.*, 765 F. Supp. 839, 841 (S.D.N.Y. 1991). In contrast, relevant insider trading cases make clear that once "outsiders" are rendered "insiders with corollary fiduciary obligations," as Archegos was here, that "position of trust gives rise to a general duty to abstain under § 10(b) . . . from making use of this information.'" *SEC v. Musella*, 578 F. Supp. 425, 439 (S.D.N.Y. 1984).

Finally, the Complaint indeed alleges Defendants knew or should have known that "Archegos was sharing information in breach of [duties] that it owed to the issuers or its [sic] shareholders." MTD at 18. In certifications that Archegos had to provide to Defendants regarding its beneficial ownership of stocks referenced in TRS, including its positions in the Issuers' stock, Archegos represented that its positions were up to 20% of those stocks, well in excess of the §§13(d) and 16 thresholds. ¶¶181-85. Moreover, Defendants were aware of numerous red flags indicating as much, and were directly involved in building up Archegos's massive positions through facilitating block trades, margin lending and TRS. ¶¶186-208, 308-16.

## II.    PLAINTIFFS ADEQUATELY PLEAD A STRONG INFERENCE OF SCIENTER

Scienter is satisfied by "conscious misbehavior or recklessness," or "motive and opportunity." *Puddu*, 2021 WL 1198566, at *11. It is adequately pled where, on all allegations taken collectively, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Kasilingam v. Tilray, Inc*., No. 20-cv-03459 (PAC), 2022 WL 4537846, at *8 (S.D.N.Y. Sept. 28, 2022). Even under the PSLRA and Rule 9(b), "great specificity is not required." *Id*.

With respect to conscious misbehavior or recklessness, ***first*** in the context of Defendants'

duty of confidence to Archegos (*supra* §I.A), allegations that Defendants "knowingly misappropriated confidential information will support an inference" of scienter. *Obus*, 693 F.3d at 287. Defendants knew they were misappropriating Archegos's MNPI by trading proprietary shares and tipping preferred clients, because they: entered into prime brokerage, block trading, TRS and related agreements with Archegos that depended on keeping its MNPI confidential; acknowledged in performing services to Archegos and in communicating with Archegos's other prime brokers that its MNPI was confidential; and had longstanding policies and practices with Archegos and throughout the industry of keeping such MNPI confidential. ¶¶186-208, 308-16.

Second, in the context of Defendants' derivative duties to the Issuers and their shareholders (*supra* §I.B), allegations that Defendants "knew *or **had reason to know***" that they received the tipped information from Archegos in breach of duties it owed to the Issuers is sufficient to plead scienter. *Obus*, 693 F.3d at 289. This "had reason to know" tippee standard is lower than the knowledge standard for misappropriation scienter, *id.*, yet Defendants never address it. *See* MTD at 18-21. At minimum, Defendants had reason to know that Archegos beneficial ownership positions in the Issuers above the requisite disclosure threshold because Archegos had made representations to them indicating as much, and also knew, among other red flags, that Archegos had attempted to evade those requirements through TRS that they arranged. *Supra* at 19. In addition, tippee liability requires deliberately trading on MNPI, *Obus*, 693 F.3d at 289, which is exactly what Defendants did by front running the market with their proprietary sales of the Issuers' stock to avoid greater losses that would occur when the risks of the MNPI materialized.

While the foregoing allegations more than suffice to plead scienter, they are bolstered by strong allegations of motive and opportunity. "Motive is adequately pleaded by showing the concrete benefits that could be realized from" alleged misconduct; "opportunity [is] shown by

alleging the means used and the likely prospect" of doing so. *Kasilingam*, 2022 WL 4537846, at *8.  The "timing and magnitude of sales alone [can be] indicative of scienter," and Defendants rapidly selling a huge amount of their proprietary Issuer stock based on Archegos's MNPI to avoid billions of dollars in losses – even as other prime brokers suffered massive losses – is undisputed and sufficient to plead an actionable motive here.  *Id.* at *10.

Similarly, as to Defendants tipping off preferred clients, the "inference of scienter is strong because the [Defendants] could not reasonably expect to benefit unless [they] deliberately tipped material non-public information that the tippee could use to an advantage in trading."  *Obus*, 693 F.3d at 286-87.  By tipping off preferred clients, Defendants helped them avoid substantial losses as well, and so attracted future business from them, which is precisely what Defendants are under government investigation for doing, and why they removed Passi and other employees.

The allegations taken collectively show that Defendants knew they were misappropriating MNPI and exploited it to save themselves and preferred clients billions of dollars.  That inference is far more compelling than any opposing inference posited by Defendants, who principally recycle their "contractual remedies" argument.  MTD at 19.  But Defendants sold their own proprietary shares, not Archegos's shares pledged as collateral or otherwise covered by any contract with Archegos. These were shares Defendants voluntarily purchased for their own profit, and which, contrary to their practice and policies, and to Archegos's detriment, Defendants illegally sold on the basis of MNPI.  Nor does the desire to avoid losses make Defendants' illicit sales "ordinary" or "legitimate business steps," if that argument held then insider trading would never state a claim for securities fraud.  Ordinary business motive is demonstrated by Archegos's other prime brokers, who adhered to their duties to refrain from trading, despite facing significant losses.  None of Defendants' arguments even pretend to refute their clear scienter for tipping preferred clients.

Finally, Defendants' claim that they did not participate in Archegos's scheme to manipulate the Issuers' stock prices is a pure distraction (MTD at 18-21), as the MNPI at issue involves Archegos's enormous undisclosed holdings and impending liquidity crisis, and scienter turns on Defendants' awareness of their duties of confidence, which is adequately alleged.

## III.   PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs' burden to plead loss causation "is not a heavy one"; it requires only "'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187, 189 (2d Cir. 2015).  There are multiple ways to meet this burden here, each of which Plaintiffs' satisfy.

*First*, Defendants trading on the MNPI itself caused harm to Plaintiffs and the Class.  *In re Aegean Marine Petroleum Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 177 (S.D.N.Y. 2021).  Defendants sold large quantities of Issuer stock into the market that they knew had a substantially lower value than the then-prevailing price which price would soon fall when the undisclosed risks associated with the MNPI materialized – that is precisely why Defendants were front-running the market. ¶¶313-16; *see Loreley*, 797 F.3d at 188 (dumping assets to pass along risk sufficient to plead causation); *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 529-30 (S.D.N.Y. 2015).

*Second*, Defendants trading on the confidential MNPI "conceal[ed] a condition or event" – that the value of the Issuers' stock would soon drop due to Archegos's large positions in them and its deepening liquidity crisis – and under bedrock securities law it is "the materialization of th[is] undisclosed condition or event that cause[d] the loss" investors suffered here.  *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015).  Defendants' sales of proprietary shares and tipping of clients to do the same were a materialization of the conditions and risks from this concealed MNPI, for Defendants took illegal actions, which drove down the Issuers' stock, precisely to avoid even greater losses on that stock when Archegos would soon be forced to

liquidate its massive positions in those stocks at fire-sale prices. ¶¶296-307. As in *Sharette*, here stock prices "plummeted" upon defendants' "massive" sales. 127 F. Supp. 3d at 103-04; *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc*, 343 F.3d 189, 197–98 (2d Cir. 2003) (same).

These allegations are more than sufficient to plead loss causation, and Defendants have no valid response. For example, Defendants imply that Plaintiffs must allege a corrective disclosure (MTD at 21), but that is untrue, as it is beyond dispute that a materialization of the risk, and any of the events discussed above allege loss causation here. *E.g.*, *Sharette*, 127 F. Supp. 3d at 103.[6] Moreover, as Judge Rakoff held in addressing claims against an outside investor who chose "not to disclose his substantial ownership" positions in violation of §§13(d) and 10(b), a loss causation theory that "stock dissipated gradually, rather than in discrete amounts in response to particular events on specific dates" is "well-grounded in precedent from this and other circuits." *Gruber v. Gilbertson*, No. 16-cv-9727 (JSR), 2022 WL 4232834, at *6, 10 (S.D.N.Y. Sept. 14, 2022).

Finally, Defendants' claim that the Issuers' securities declined for alternative reasons, fails several times over. MTD at 21-22. At base, it ignores that Defendants' misconduct need not be the ***sole*** cause of the alleged loss; Plaintiffs can "plead loss causation without alleging facts that disaggregate losses or that rule out other causes." *Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 Civ. 0917 (LGS), 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018).. Even if other factors were impacting the Issuers' stock, Defendants insider trading did so as well – they sold massive proprietary positions precisely to get ahead of the greater drops that would occur from Archegos's pending fire-sale. Furthermore, Defendants' supposed intervening factors appear to be additional materializations of the very confidential MNPI they traded on – like the other prime brokers' later

---

[6]     Defendants' claim that Plaintiffs "devote a sum total of two paragraphs" to loss causation is disingenuous. *See* MTD at 21. The Complaint must be read as a whole, and numerous paragraphs do so, as discussed above.

liquidation of the Issuers' stock – and so causally connected to Defendants misconduct in any event. Whether and to what extent the Issuers' stocks may have been impacted by "intervening event[s]" "[i]s a matter of proof at trial," not a grounds for dismissal here. *Emergent Cap.*, 343 F.3d at 197; *Gruber*, 2018 WL 1418188, at \*7.

## IV.    SECTION 20A: PLAINTIFFS IN *FELIX* AND *SCULLY* BOTH PLEAD CONTEMPORANEOUS TRADING

Defendants misconstrue the relevant timeline and argue, incorrectly, that the *Felix* and *Scully* Lead Plaintiffs' purchases on March 24, 2021 were not contemporaneous with Defendants' illicit trades and client tips. *See* 15 U.S.C. §78t-1. The Class Period here runs from March 22 to March 29, 2021. ¶15. Plaintiffs allege that by March 22, Defendants already had confidential MNPI regarding Archegos's concentrated holding and growing liquidity crisis, and, moreover, on that date, following escalating margin calls over the course of 1Q 2021 and other red flags, Archegos indicated that it would be unable to meet additional margin calls. ¶¶186-208, 308-16. That is, contrary to Defendants' claim, Plaintiffs are not alleging that Defendants duty of confidentiality and receipt of MNPI only began with the meetings on March 25, 2022. *See* MTD at 23. Plaintiffs also allege that Defendants had already begun selling off proprietary shares and tipping clients by the start of the Class Period, and further point to such specific sales and tips involving the Issuer stock ***on March 24, 2022***. ¶¶192-97, 315. As Lead Plaintiffs in *Felix* and *Scully* both traded on that date, they satisfy the contemporaneous trading requirement (¶22) – not to mention that Plaintiffs allege Defendants had begun insider trading by the start of the Class Period, on March 22, and the "standard for contemporaneity is a reasonable period" that encompasses purchases within five days to a week of any of those alleged trades. *See, e.g., SEC v. McCaskey,* No. 98CIV6153SWKAJP, 2002 WL 850001, at \*11 n.15 (S.D.N.Y. Mar. 26, 2002).

## V.      SECTION 20(A): DEFENDANTS HAD THE POWER TO CONTROL PRIMARY VIOLATOR EMPLOYEES

Contrary to Defendants' claim, Plaintiffs have alleged Defendants' power to control "specific employees" who were engaged in the alleged insider trading and front-running.  MTD at 24.  Courts in the Second Circuit and nationwide recognize that employment relationships suffice to plead control.  *E.g., In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017).  Further, control "requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."  *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).  Plaintiffs satisfy this requirement, as Defendants do not deny that their rapid, massive liquidation of their proprietary shares based on MNPI was a deliberate policy that their employees took.  Likewise, Plaintiffs allege specific employees of Defendants who are under regulatory investigation for tipping hedge fund clients, including with regard to Archegos's MNPI, such as Passi at Morgan Stanley and Michael Daum at Goldman.  ¶¶74-75, 243.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[7]

---

[7]      To the extent the Court is inclined to grant the MTD in part or in full, Plaintiffs respectfully request leave to amend.

DATED:  October 18, 2022

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Max R. Schwartz*

Max R. Schwartz
Marc J. Greco
Emilie B. Kokmanian (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
mschwartz@scott-scott.com
mgreco@scott-scott.com
ekokmanian@scott-scott.com

*Lead Counsel for the IQIYI Class, Co-Lead
Counsel for the Discovery Class and Co-Chair of
the Executive Committee*

*/s/ David W. Hall*

**HEDIN HALL LLP**
David W. Hall (pro hac vice)
Armen Zohrabian (pro hac vice forthcoming)
Arun Ravindran (pro hac vice forthcoming)
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: 415-766-3534
Facsimile:  415-402-0058
dhall@hedinhall.com
azohrabian@hedinhall.com
aravindran@hedinhall.com

*Lead Counsel for the Baidu Class and Co-Chair of
the Executive Committee*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
Brian Calandra
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8655
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com
bcalandra@pomlaw.com

*Lead Counsel for the ViacomCBS and Tencent*
*Classes and Executive Committee Member*
**BRONSTEIN, GEWIRTZ &**
**GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Named Plaintiff Kai Chen*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  213-519-5876
brian@schallfirm.com

*Executive Committee Member*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net

*Co-Lead Counsel for the Gaotu Class &*
*Executive Committee Member*

27

**JOHNSON FISTEL, LLP**
Ralph M. Stone
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (212) 292-5960
Facsimile: (212) 292-5680
RalphS@johnsonfistel.com

Michael I. Fistel, Jr. (*pro hac vice*)
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Lead Counsel for the Vipshop Class & Executive*
*Committee Member*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com

*Co-Lead Counsel for the Discovery Class &*
*Executive Committee Member*

**ROSCA & SCARLATO LLC**
Alan L. Rosca (*pro hac vice*)
23250 Chagrin Boulevard, Suite 100
Beachwood, OH 44122
Telephone: (216) 570-0097
arosca@rscounsel.law

Paul Scarlato (*pro hac vice* forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: 216-946-7070
pscarlato@rscounsel.law

*Co-Lead Counsel for the Gaotu Class*

**KIRBY McINERNEY LLP**
Ira M. Press
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212-371-6600
ipress@kmllp.com

*Local Counsel for the Gaotu Class*