**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEW KING TAN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:21-cv-08413-PAC |
| v. | |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |
| TRAVIS FLORIO, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:21-cv-08618-PAC |
| v. | |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |

| | |
|---|---|
| MICHAEL MERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-08752-PAC |
| MARK ULANCH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-08897-PAC |
| ALMA FELIX, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-10286-PAC |

| | |
|---|---|
| ALISON SCULLY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-10791-PAC |
| KEVIN LEE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:22-cv-00169-PAC |

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

I.      PLAINTIFFS DO NOT ALLEGE ANY MISAPPROPRIATION ........................2

   A.  Defendants Had No Duty to Refrain from Unwinding Their Hedges ....................2

   B.  Defendants Were Not Tippees ..................................................................7

II.     THERE IS NO STRONG INFERENCE OF SCIENTER ......................................8

III.    PLAINTIFFS DO NOT ALLEGE LOSS CAUSATION ........................................9

IV.     THE SECTION 20A AND 20(a) CLAIMS FAIL .................................................10

CONCLUSION.................................................................................................10

# **TABLE OF AUTHORITIES**

PAGE

CASES

Am. Standard Inc. v. Crane Co.,
510 F.2d 1043 (2d Cir. 1974) ......................................................................................... 8

Asbestos Workers Local 42 Pension Fund v. Bammann,
2015 WL 2455469 (Del. Ch. May 22, 2015) .................................................................. 6

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ........................................................................................................ 4

Cambridge Capital LLC v. Ruby Has LLC,
565 F. Supp. 3d 420 (S.D.N.Y. 2021) ............................................................................ 6

Chiarella v. United States,
445 U.S. 222 (1980) ........................................................................................................ 2

Donoghue v. Bulldog Investors General Partnership,
696 F.3d 170 (2d Cir. 2012) ........................................................................................... 8

In re Flag Telecom Holdings, Ltd. Sec. Litig.,
574 F.3d 29 (2d Cir. 2009) ............................................................................................. 9

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005) ........................................................................................... 9

SEC v. Singer,
786 F. Supp. 1158 (S.D.N.Y. 1992) ............................................................................... 4

Tellabs, Inc. v. Makor Issues & Rts., Ltd.,
551 U.S. 308 (2007) ........................................................................................................ 8

United States v. Carpenter,
791 F.2d 1024 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987)................................................ 7

United States v. Kosinski,
976 F.3d 135 (2d Cir. 2020) ........................................................................................... 4

United States v. O'Hagan,
521 U.S. 642 (1997) .................................................................................................... 3, 7

Veleron Holding, B.V. v. Morgan Stanley
117 F. Supp. 3d 404 (S.D.N.Y. 2015) ............................................................................ 5

## PRELIMINARY STATEMENT

Plaintiffs' opposition fails to rebut defendants' showing that the amended complaints do not state a claim.  To plead insider trading, in addition to scienter and loss causation, plaintiffs acknowledge that they must allege facts with particularity supporting either a misappropriation theory or a tippee theory (Opp. 6), but they do neither.  As to misappropriation, plaintiffs fail to show that defendants owed a duty to Archegos not to trade.  To the contrary, according to the amended complaints: (i) defendants held neutral hedges corresponding to their respective swaps with Archegos; (ii) Archegos defaulted on its margin obligations on those swaps; and (iii) in response, defendants terminated the swaps and unwound their hedges.  Defendants had no duty to Archegos to *maintain* their hedges after Archegos *defaulted*.  Nor did defendants "exploit" their knowledge of Archegos's default.  As Archegos itself acknowledged at the time, defendants had every right to terminate the swaps and sell down the corresponding neutral hedges, a reality unchanged by plaintiffs' insistence that those hedges were "proprietary."

Nor do plaintiffs provide any plausible basis to think that defendants were "tippees" of Archegos, a theory requiring allegations that Archegos provided them with information obtained from others that Archegos was not entitled to share.  Plaintiffs claim that Archegos allegedly shared information related to its *own* trading positions—not information misappropriated from another source—and that Archegos was somehow an "insider" of the issuers based on reporting obligations under Sections 13(d) or 16.  Plaintiffs do not cite any precedent supporting this theory.  Nor do they identify any well-pleaded allegations that either defendant *knew* of Archegos's alleged schemes.  To the contrary, the complaints make clear that Archegos repeatedly lied to its counterparties, including defendants.

Plaintiffs also have no meaningful answer to defendants' arguments about the other allegations necessary to their claims.  The complaints fail to plead that defendants sought to

defraud anyone, that defendants' actions caused plaintiffs any loss, that certain plaintiffs traded contemporaneously with defendants, or that defendants were control persons under Section 20(a). The complaints should be dismissed, with prejudice.

## I.   PLAINTIFFS DO NOT ALLEGE ANY MISAPPROPRIATION

### A.   Defendants Had No Duty to Refrain from Unwinding Their Hedges

As defendants' brief demonstrated (Mem. 9-16), plaintiffs fail to plead that defendants breached "a fiduciary or other similar relation of trust and confidence" to Archegos when they sold their hedge positions following Archegos's default. *See Chiarella v. United States*, 445 U.S. 222, 228 (1980). Plaintiffs' opposition fails to rebut that showing.

Plaintiffs cite allegations that Archegos *asked* defendants (and its other counterparties) to forbear from trading on March 25 and 26, 2021 (Opp. 9-10 (citing ¶¶ 198-208)), but never explain how that *request* could impose a duty on defendants not to unwind their hedges. Defendants never acceded to Archegos's request, and Archegos evidently made that request because it understood that defendants could and would liquidate those hedge positions upon Archegos's default. (Mem. 11-12; *see also* ¶¶ 151, 173, 200-03, 206.)[1] Plaintiffs' assertion that Archegos's other swap counterparties did not sell their hedges (Opp. 2-3, 5, 10) not only is belied by their own allegations that other counterparties sold on March 26 (¶¶ 206, 229), but also is beside the point, because what other counterparties allegedly did fails to show that defendants were under any duty not to trade. In any event, plaintiffs cannot plausibly contend that defendants' trading breached a duty when their own complaints allege that defendants gave Archegos prior notice that they were terminating the swaps before they sold their hedges. (¶ 206.) The complaints thus fail to allege that defendants' trading was deceptive or

---

[1] As in defendants' opening brief, paragraph citations are to the amended complaints in *Tan v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08413, ECF 54.

"defraud[ed] [Archegos] of the exclusive use of [any] information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). (Mem. 16.)

The complaints make clear that defendants' hedges were entirely bound up with the swaps and would be sold when the swaps were unwound. The complaints expressly allege that the swaps were essentially loan transactions, that defendants "contemporaneously" executed "risk-neutral" hedge transactions corresponding to Archegos's swaps "[i]n adherence with industry standards," and that, by entering the swaps, Archegos effectively "caused" defendants to acquire these hedges. (¶¶ 45, 101, 110-11.) In other words, Archegos fully understood that defendants would hedge to remain risk-neutral with respect to the swaps. Against this backdrop, plaintiffs' assertion that defendants owed Archegos a duty "not to trade" the hedges after its own default makes no sense. As the complaints allege, defendants *put on* the hedges to remain risk-neutral, and it follows—also as alleged in the complaints—that they would *close them out* when the swaps were terminated. (¶ 206 (Archegos's failure to satisfy defendants' margin calls "meant that [defendants] . . . terminated the swaps and exited the associated hedges by selling the same securities referenced in the swaps into the market.").)

Faced with these realities, plaintiffs advance a hodgepodge of other contentions in an effort to find a duty. They contend that defendants owed Archegos a duty not to trade under unspecified "internal policies" and "standard practices" (Opp. 7, 10), or because clients like Archegos "pay a premium for confidentiality and expertise" from prime brokers (Opp. 8). Their contentions have no merit. The Second Circuit has made clear that broker-dealers owe no general duties of confidence to counterparties in arm's-length transactions. (Mem. 12-13 (citing cases).) Plaintiffs ignore these authorities, as well as the precept that mere receipt of confidential information does not create a duty not to trade. (Mem. 10, 14-15.) And their references to

unspecified internal policies and expectations of confidentiality do not amount to particularized allegations that defendants owed a duty to Archegos not to sell their hedges.  (Mem. 13, 18-19 (citing cases).)  These allegations are thus distinguished from those in the cases plaintiffs cite, where there *were* particularized allegations of a duty.  *See United States v. Kosinski*, 976 F.3d 135, 146-47 (2d Cir. 2020) (alleging that defendant, the investigator in an issuer's drug trials, had a contract with the issuer to hold its information "in strict confidence" and to disclose all investments above $50k, then traded in violation of both provisions after learning adverse information about the trials); *SEC v. Singer*, 786 F. Supp. 1158, 1169-70 (S.D.N.Y. 1992) (alleging both an attorney-client relationship and "very close personal relationship").[2]

Similarly, plaintiffs' assertion that "confidentiality was essential" to Archegos because Archegos purportedly wanted "to hide its massive exposure from the Issuers" and avoid reporting obligations (Opp. 8) fails to show any duty by defendants not to sell their hedges upon Archegos's default.  Archegos's own desire to keep information confidential does not—absent defendants' agreement—create a duty not to trade.  (Mem. 14-15 (citing cases).)  And the complaints do not allege any facts suggesting that defendants *knew* what positions Archegos had with other counterparties or that it had exceeded any ownership reporting thresholds.[3]  Rather, as plaintiffs allege, Archegos materially misled its counterparties about its overall portfolio.  (Mem. 8, 19-20.)  The "script" allegedly read in the late March calls, which stated that counterparties "were not permitted to disclose their respective Archegos related position[s]" (¶ 202), just

---

[2] None of the 50 complaint paragraphs cited by plaintiffs suggests that defendants owed Archegos any duty of trust and confidence not to liquidate.  (Opp. 8, 10 (citing ¶¶ 44-69, 83-84, 90-101, and 104-12).)  The word "confidential" appears twice—once in a heading, and once in relation to block trade negotiations (¶ 61) that plaintiffs concede proceeded with Archegos's express permission (¶¶ 200, 204; Mem. 16 n.4).  The word "duty" appears only once (¶ 112), and it is merely asserted as a legal conclusion that need not be accepted as true on.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] Plaintiffs' citations to Archegos's certifications regarding its beneficial ownership (Opp. 19 (citing ¶¶ 181-85)) refer only to an unnamed counterparty that the complaint elsewhere indicates was *Credit Suisse*, and not either of defendants here (¶ 5).

confirms that counterparties *were not disclosing their respective positions with Archegos to one another* (*see* ¶¶ 153-54, 169, 172, 176, 179).

Plaintiffs rely heavily on *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015), but *Veleron* is readily distinguishable.  There, Morgan Stanley allegedly received Veleron's confidential information in its dual capacities as collateral disposal agent to the agent bank and as swap counterparty for Veleron's debt, and then allegedly used that information (without informing Veleron) to open new short positions on the stock that collateralized Veleron's loan in anticipation of Veleron's default.  *Id.* at 413, 415, 420-21.  The court held that the complaint raised a triable issue of fact as to whether Veleron had an expectation that Morgan Stanley would not trade on the information that it had received.  *Id.* at 442-47.  Here, by contrast, plaintiffs allege that defendants either had Archegos's consent or notified Archegos before selling (Mem. 6, 15-16), and the complaints' allegations make clear that Archegos *had no expectation that defendants would not sell their hedges* (Mem. 10-12). Nor is there any allegation here that—as in *Veleron*—defendants put on new positions or shorted stock to gain from any anticipated price drop.  Instead, defendants are alleged simply to have unwound the hedges that Archegos had "caused" them to put on in the first place, a direct function of Archegos's default.  (*See* ¶¶ 101, 206.)

Plaintiffs' insistence that defendants' hedges were "proprietary" positions fails to establish any duty between defendants and Archegos.  (Opp. 1-4, 6-8, 11-16.)  To the extent plaintiffs suggest that these allegedly risk-neutral hedges were intended to generate independent trading profits, their argument contradicts the complaints, which plaintiffs may not amend through briefing.  *See*, *e.g.*, *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453

n.11 (S.D.N.Y. 2021).[4]  More fundamentally, plaintiffs never explain how the "proprietary" label

makes any difference.  Whether or not the hedges were "proprietary," the complaints still fail to

show that defendants were barred from selling the hedges when Archegos defaulted.  Everyone,

Archegos included, understood that the hedges could and would be sold after Archegos

defaulted.  Plaintiffs essentially concede that defendants were free, upon Archegos's default, to

sell the collateral that Archegos had pledged.  (*See* Opp. 13-14.)  They offer no plausible reason

to think that defendants were not also free, upon Archegos's default, to sell the hedges

corresponding to the swaps.[5]

Lastly, in a final effort to find a duty, plaintiffs point to alleged "frontrunning" and

tipping of favored hedge fund clients by defendants.  (Opp. 2-3, 5, 11-16, 20, 22, 25.)  No well-

pleaded factual allegations back those assertions.  A broker engages in frontrunning by trading

for itself *before* executing a trade on behalf of a client to "benefit from the . . . market impact" of

the client's trade.  (¶ 67.)  Contrary to plaintiffs' opposition, the complaints do not allege that

defendants executed any trades *before* transacting on behalf of Archegos.  Rather, the complaints

allege that, after first selling off blocks *with Archegos's consent*, defendants subsequently

declared default, terminated the swaps and sold down their hedges on the terminated swaps.

(¶¶ 200, 204, 206, 229.)  In other words, by plaintiffs' own allegations, defendants' allegedly

"proprietary" sales did not front run any client trade.  Likewise, the complaints fail to allege that

---

[4] It also contradicts the typical understanding of proprietary trading.  *See Asbestos Workers Loc. 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *4 n. 24 (Del. Ch. May 22, 2015) (distinguishing proprietary trading, which involves "trading to generate profits using its own account" from "hedge trades" to "manage[] risk").  Plaintiffs' position, if accepted, could significantly impair the ability of swap counterparties to hedge their risk if they might be precluded from selling those hedges upon terminating the swaps.

[5] The complaints' allegations make clear that the forbearance Archegos sought from its counterparties necessarily included the hedges.  As plaintiffs allege, Archegos convened the forbearance call among its counterparties to "thwart a large scale liquidation" upon its default (¶ 200), and the vast majority (all but 5%, at most) of Archegos's positions were swaps (¶¶ 104, 122).  The "large scale" sell-off that Archegos expected obviously included the hedges.

defendants tipped any hedge fund clients of any impending sell-off regarding Archegos; they cite only to generalized news reports regarding block trading investigations that are not alleged to have any connection with the trading around Archegos's default.  (Mem. 8.)

### B.   Defendants Were Not Tippees

Plaintiffs' alternative theory for insider trading—that Archegos improperly tipped defendants in breach of a duty to the issuers whose stock defendants sold (Opp. 17-19)—also fails.  As defendants have shown (Mem. 16-18), plaintiffs do not even assert, much less properly allege, that Archegos misappropriated any information from the issuers, a necessary predicate to holding defendants liable as tippees for trading on any such information.[6]  To the contrary, the only information purportedly shared by Archegos was its *own* information about its *own* trading positions.  Plaintiffs cite no authority suggesting how Archegos could "defraud" the issuers "of the exclusive use of that information."  *O'Hagan*, 521 U.S. at 652.[7]

Plaintiffs also fail to support their assertion that Archegos's purported obligation under Sections 13 and 16 of the Exchange Act to file reports of its beneficial ownership—which is the *only* obligation plaintiffs claim Archegos violated—can form the basis for a claim of insider trading.  (Opp. 17; Mem. 17-18.)  In the insider trading cases cited by plaintiffs, the defendants' alleged fiduciary duties arose from their roles within (or control over) the company, not reporting obligations under Sections 13 and 16.  (Opp. 18.)  The only two cases plaintiffs cite for the proposition that Sections 13 and 16 can give rise to a *fiduciary* duty are inapposite.  In *Donoghue*

---

[6] Plaintiffs also fail to articulate the personal benefit received by Archegos, the alleged tipper, as required for tippee liability.  (Mem. 10 (citing cases).)  Moreover, a personal benefit to Archegos would be inconsistent with plaintiffs' primary theory that defendants supposedly traded to Archegos's detriment.  (Opp. 21.)

[7] Plaintiffs assert that it is irrelevant that the information came from Archegos and not the issuers (Opp. 18), but *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987), does not support their position.  There, unlike here, the defendant traded on information misappropriated from his employer in violation of a fiduciary duty of confidentiality.  *Carpenter*, 791 F.2d at 1029.  Here, by contrast, there is no allegation that Archegos misappropriated information in violation of any duty to anyone.

*v. Bulldog Investors General Partnership*, the Second Circuit held that beneficial owners who do not report their 10% or greater interests in an issuer have a specific "fiduciary duty" created by Congress in Section 16(b) "to refrain from engaging in any short-swing trading."  696 F.3d 170, 177 (2d Cir. 2012); *accord Am. Standard Inc. v. Crane Co.*, 510 F.2d 1043, 1046-47.  Nothing in those cases suggests that Section 16(b) somehow creates a general fiduciary duty to the issuer or makes an investor's own information about its positions the "inside information" of the issuer. *Donoghue*, in fact, specifically disclaimed any interpretation of Section 16(b) that equated a 10% beneficial ownership with "inside information."  696 F.3d at 177-78.  Finally, plaintiffs do not allege that defendants *knew* the overall size of Archegos's positions; rather, the complaints allege that Archegos misrepresented its exposures to defendants.  (Mem. 8, 19-20.)

## II.     THERE IS NO STRONG INFERENCE OF SCIENTER

Even if plaintiffs had pleaded the other requisite elements of an insider trading theory, their complaints do not support the necessary strong, cogent and compelling inference of scienter on the part of defendants.  Rather, the conduct alleged in the complaints demonstrates a "plausible, nonculpable explanation" for defendants' conduct, which defeats a claim of scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).  Defendants liquidated their hedges upon closing out their swaps with Archegos, *not* in an attempt to defraud the market, but rather because that is what swap counterparties do—and have every right to do—when a counterparty defaults.  (Mem. 18-21.)  There is nothing suspicious about the "timing and magnitude" of defendants' alleged trading (Opp. 21), which corresponded to their hedge positions and occurred *after* Archegos's default.  (*See supra* 6-7.)  Nor are there any allegations that defendants did anything different from what they would have done if the March 25 call with Archegos had never occurred.  The *only* reasonable inference is the entirely plausible, nonculpable explanation that defendants followed the standard and perfectly legitimate practice

of closing out their hedges upon terminating swaps in response to a default.  Such legitimate business steps do not indicate scienter.  (Mem. 20 (citing cases).)[8]  Plaintiffs also argue that defendants had a motive for tipping their hedge fund clients about block trades (Opp. 20-21), but as shown above, the complaints do not allege that defendants tipped anyone about the block trading connected to Archegos's default (*compare* Opp. 20 *with supra* 7-8; *see also* Mem. 8).

## III.   PLAINTIFFS DO NOT ALLEGE LOSS CAUSATION

Plaintiffs' opposition fails to show how the complaints plead loss causation.  Plaintiffs assert that defendants' trading itself harmed plaintiffs, purportedly by concealing that the issuers' stock prices would drop when Archegos's large, concentrated positions were unwound, flooding the market with stock.  (Opp. 22.)  None of this is alleged in the complaints, which solely try to plead loss causation based on corrective disclosures (¶¶ 317-18, 351; *see also* Mem. 21-22) and do not attempt to plead a materialization of a risk concealed by defendants.  Plaintiffs, if anything, allege that prices were bound to fall when Archegos's scheme collapsed (¶¶ 1, 9, 13, 123, 135-38), not as the result of defendants' sales.  Even assuming that the complaints plausibly allege that *Archegos* created disruptions in the market, plaintiffs have not proposed how *defendants'* purported conduct was the "cause of the actual loss suffered."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (analogizing "loss causation to proximate cause," meaning that damages must foreseeably result from the defendant's omission).  In short, plaintiffs offer no reason to think they would have avoided losses "but for" defendants' alleged misconduct.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 175 (2d Cir. 2005) (a complaint must also allege facts supporting an inference "that plaintiffs would have been spared all or an ascertainable portion of th[e] loss absent the fraud").

---

[8] Plaintiffs do not even try to distinguish this case law.  (Opp. 21.)

## IV.    THE SECTION 20A AND 20(a) CLAIMS FAIL

Defendants established that the lead plaintiffs in *Felix* and *Scully* failed to plead contemporaneous trading because they do not allege any purchases on or after March 26, 2021, the date defendants allegedly first sold stock after receiving confidential information about Archegos's impending failure on March 25.  (Mem. 23 (citing ¶¶ 8, 206).)  Plaintiffs' bald assertion that defendants "had begun insider trading by the start of the Class Period, on March 22" (Opp. 24) lacks any basis in any factual allegation in the complaints.  Moreover, any pre-March 26 trading could not have been based on Archegos's confidential information that defendants allegedly received late on March 25.  Plaintiffs' March 24 transactions thus are not contemporaneous with any challenged trading by defendants.  (Mem. 23.)

Plaintiffs' Section 20(a) claims independently fail because plaintiffs do not identify any control by defendants over the actors who engaged in the trading at issue.  (Mem. 24.)  Plaintiffs merely reiterate their bald assertions of defendants' control over unnamed "specific employees." (Opp. 25.)  That assertion is inadequate to establish control of any employees who traded on confidential information.  (Mem. 24.)

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their motions to dismiss the amended complaints with prejudice.

Dated: December 2, 2022              **DAVIS POLK & WARDWELL LLP**

By: /s/ *Charles S. Duggan*

10

Charles S. Duggan
Daniel J. Schwartz
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
charles.duggan@davispolk.com
daniel.schwartz@davispolk.com

*Counsel for Defendant Morgan Stanley*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By: */s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Michael Cinnamon
Mijin Kang
Olivia Everton
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
cboccuzzi@cgsh.com
mcinnamon@cgsh.com
mkang@cgsh.com
oeverton@cgsh.com

*Counsel for Defendant Goldman Sachs Group, Inc.*

11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 2, 2022, the foregoing REPLY

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS

THE AMENDED CLASS ACTION COMPLAINTS was electronically filed with the Clerk of

Court using the CM/ECF system that will send notification of such filing to all counsel of record.

By:      /s/ *Charles S. Duggan*
       Charles S. Duggan