**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEW KING TAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-08413-PAC |
| TRAVIS FLORIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>Defendants. | Case No.: 1:21-cv-08618-PAC |

| | |
|---|---|
| MICHAEL MERSON, Individually and on Behalf of All Others Similarly Situated,<br><br><br>          Plaintiff,<br>    v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br><br>          Defendants. | Case No.: 1:21-cv-08752-PAC |
| MARK ULANCH, Individually and on Behalf of All Others Similarly Situated,<br><br><br>          Plaintiff,<br>    v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br><br>          Defendants. | Case No.: 1:21-cv-08897-PAC |
| ALMA FELIX, Individually and on Behalf of All Others Similarly Situated,<br><br><br>          Plaintiff,<br>    v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br><br>          Defendants. | Case No.: 1:21-cv-10286-PAC |

| | |
|---|---|
| ALISON SCULLY, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No.: 1:21-cv-10791-PAC |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |
| KEVIN LEE, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No.: 1:22-cv-00169-PAC |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ........................................................................................4

    A.    Archegos and its Transactions with Defendants...........................4

    B.    In March 2021, After Its Positions Fall in Value, Archegos Defaults and Defendants Exercise their Contractual Remedies.......................................6

    C.    Aftermath of Archegos's Collapse.............................................7

    D.    The Court's Dismissal Opinion and Order and the Second Amended Complaints ..............................................................................8

ARGUMENT ............................................................................................10

    A.    Plaintiffs Fail to Allege a Tippee Claim ....................................10

        1.    Plaintiffs fail to allege that Archegos was an insider that possessed or shared any confidential information belonging to the issuers. ..10

        2.    Plaintiffs fail to plead the remaining elements of a tippee claim...14

    B.    Plaintiffs' Misappropriation Theory Fails .................................18

II.    PLAINTIFFS DO NOT ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ...................................................21

III.    THE SECTION 20A AND 20(A) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION AND ADDITIONAL REASONS ..........................24

    A.    The Section 20A Claims in *Felix* and *Scully* Must Be Dismissed Because Plaintiffs Do Not Allege Contemporaneous Trading .................24

    B.    The Section 20(a) Claims Fail Because Plaintiffs Do Not Allege That Defendants Exercised Control Over Any Relevant Actor.................25

CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Alstom SA,*
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................... 25

*Arbitrage Event-Driven Fund v. Tribune Media Co.,*
2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ...................................................... 13

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,*
28 F.4th 343 (2d Cir. 2022).................................................................... 22, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... *passim*

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) ...................................................................... 17

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................... 20

*Chiarella v. United States,*
445 U.S. 222 (1980) ........................................................................... 11, 12

*Chill v. Gen. Elec. Co.,*
101 F.3d 263 (2d Cir. 1996) ...................................................................... 23

*Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) ......................................................................... 8

*de Kwiatkowski v. Bear, Stearns & Co.,*
306 F.3d 1293 (2d Cir. 2002) .................................................................... 21

*DeMarco v. Robertson Stephens Inc.,*
318 F. Supp. 2d 110 (S.D.N.Y. 2004) ......................................................... 13

*Dirks v. SEC,*
463 U.S. 646 (1983) ....................................................................... *passim*

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan,*
553 F.3d 187 (2d Cir. 2009) ...................................................................... 20

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976) ............................................................................... 21

*In re FBR Inc. Secs. Litig.,*
544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..................................................... 19, 20

*Feldman v. Simkins Indus., Inc.,*
679 F.2d 1299 (9th Cir. 1982) .................................................................... 13

*Fezzani v. Bear, Stearns & Co.*,
    592 F. Supp. 2d 410 (S.D.N.Y. 2008) ........................................................................ 23

*Gordon v. Sonar Cap. Mgmt. LLC*,
    962 F. Supp. 2d 525 (S.D.N.Y. 2013) .................................................................. 16, 23

*Gruber v. Gilbertson*,
    2021 WL 2482109 (S.D.N.Y. June 17, 2021) ............................................................ 13

*Intellivision v. Microsoft Corp.*,
    784 F. Supp. 2d 356 (S.D.N.Y. 2011) ........................................................................ 21

*Log On Am., Inc. v. Promethean Asset Mgmt. LLC*,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001) ........................................................................ 16

*Moss v. Morgan Stanley Inc.*,
    719 F.2d 5 (2d Cir. 1983) ........................................................................................... 11

*In re MRU Holdings Secs. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ........................................................................ 23

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) .......................................................................................... 16

*O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*,
    559 F. Supp. 800 (S.D.N.Y. 1983) ............................................................................. 24

*Palm Beach Strategic Income, LP v. Salzman*,
    457 F. App'x 40 (2d Cir. 2012) .................................................................................. 19

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ....................................................................................... 21

*Ross v. Bolton*,
    639 F. Supp. 323 (S.D.N.Y. 1986) ............................................................................. 23

*Salinger v. Projectavision, Inc.*,
    972 F. Supp. 222 (S.D.N.Y. 1997) ............................................................................. 15

*Salman v. United States*,
    580 U.S. 39 (2016) ...................................................................................... 10, 11, 17

*In re Satyam Comp. Servs. Ltd. Secs. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013) ........................................................................ 22

*Sawant v. Ramsey*,
    742 F. Supp. 2d 219 (D. Conn. 2010) .................................................................. 11, 12

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012) ....................................................................................... 22

*Starostenko v. UBS AG*,
    2022 WL 1082533 (S.D.N.Y. Apr. 7, 2022) .............................................................. 19

*Steginsky v. Xcelera Inc.*,
   741 F.3d 365 (2d Cir. 2014) ............................................................................ 12

*Sulton v. Wright*,
   265 F. Supp. 2d 292 (S.D.N.Y. 2003) .............................................................. 16

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) .............................................................. 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ........................................................................................ 21

*United States v. Chestman*,
   947 F.2d 551 (2d Cir. 1991) ............................................................................ 21

*United States v. Klein*,
   913 F.3d 73 (2d Cir. 2019) .............................................................................. 14

*United States v. Martoma*,
   894 F.3d 64 (2d Cir. 2017) ................................................................... 10, 12, 14

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................................... 12, 18, 20

*Veleron Holding, B.V. v. Morgan Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015) .............................................................. 10

*W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
   344 F. App'x 717 (2d Cir. 2009) ...................................................................... 22

### STATUTES & RULES

15 U.S.C. § 78u-4 ................................................................................................... 10

Fed. R. Civ. P. 9(b) ............................................................................................... 10

*\*Unless otherwise stated, all internal case citations and quotation marks are omitted, and all emphasis is added.*

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Goldman Sachs Group, Inc. ("Goldman Sachs") and Morgan Stanley (together, "defendants") respectfully submit this memorandum of law in support of their motions to dismiss with prejudice the second amended complaints in these coordinated actions (the "amended complaints").[1]

## PRELIMINARY STATEMENT

The amended complaints are plaintiffs' third attempt to transform defendants' close-out of their contractual relationships with Archegos Capital Management, LLC ("Archegos"), a defaulted counterparty, into unlawful insider trading.  This Court previously determined that plaintiffs' prior complaints failed to plead insider trading claims (Opinion & Order ("Op."), ECF No. 62, at 12-15, 17-18), and plaintiffs' new allegations do nothing to cure the deficiencies in their prior complaints.  The cases should now be dismissed with prejudice.

Plaintiffs' basic allegations have not changed:  Archegos, through swaps and margin accounts with defendants and other dealers, acquired large, mostly derivative positions in the seven stocks at issue.  Defendants, following standard industry practice, hedged the swap positions by buying shares of the underlying stocks in order to remain risk-neutral.  As share prices moved against Archegos in the week of March 22, 2021, Archegos asked defendants to liquidate certain of its positions, but nonetheless became unable to meet their margin calls and defaulted.  In an effort to dissuade defendants and its other counterparties from closing out their contracts and liquidating their hedges as they otherwise would, Archegos convened a call on the

---

[1] *Tan v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08413, ECF No. 66; *Florio v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08618, ECF No. 63; *Merson v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08752; ECF No. 68, *Ulanch v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08897, ECF No. 63; *Felix v. Goldman Sachs Group, Inc.*, No. 1:21-cv-10286, ECF No. 56; *Scully v. Goldman Sachs Group, Inc.*, No. 1:21-cv-10791, ECF No. 50; *Lee v. Goldman Sachs Group, Inc.*, No. 1:22-cv-00169, ECF No. 55.  Unless otherwise stated, citations are to the pleadings in *Tan*.

evening of March 25, 2021 to ask them *not* to exercise their contractual rights and to forbear from liquidating (i.e., trading), and instead to enter into a managed liquidation plan.  But none of the counterparties agreed to forbear, and the next day, defendants delivered notices of default and early termination and liquidated their collateral and swap hedges.

These alleged facts cannot support an insider trading claim.  Plaintiffs' theory that defendants were tippees of Archegos fails because the amended complaints do not allege that Archegos even *had* any material non-public information ("MNPI") belonging to the issuers, much less MNPI received in the context of a fiduciary or other special relationship of trust and confidence.  The information that Archegos allegedly provided to defendants was general information about Archegos's *own* positions and *own* liquidity.  That information was not acquired from (and did not belong to) any issuer, thus precluding plaintiffs' attempt to invoke any recognized theory of tipper/tippee liability.  Plaintiffs' labeling this information as an insider "tip" is nonsensical and conflicts with decades of insider trading law.  Further, the amended complaints do not allege facts demonstrating that Archegos actually *was* an insider of the issuers with a duty to keep information confidential—let alone that *defendants knew* that Archegos had purportedly breached such a duty.  The tippee claims fail for these independent reasons as well.

Nor do plaintiffs cure their failure—which led to dismissal of their prior complaints—to allege facts showing that Archegos improperly shared MNPI for a personal benefit, and with the expectation that defendants would trade on it.  (*See* Op. 17-18.)  The complaints now allege that Archegos shared MNPI with defendants throughout its relationship with them to obtain the purported financial, reputational, and relationship benefits of trading with defendants.  But plaintiffs fail to plead with particularity any purportedly confidential information Archegos shared with defendants before March 25, 2021, much less that any defendant traded based on any

2

such information.  As to the supposed MNPI provided on March 25, 2021, the amended complaints again affirmatively allege that Archegos provided this information in an effort to delay or avoid its inevitable default and liquidation.  As the Court previously held, Archegos's purpose was to persuade "Defendants to *refrain* from trading" (Op. 18)—not an expectation that defendants would provide some benefit to Archegos in exchange for a quid-pro-quo "tip" of issuer information that they could trade on and monetize.  These remain the core, immutable facts, and this Court previously held that they do not state a claim for insider trading.  Realleging them in the amended complaints does not change that result.

Plaintiffs' misappropriation theory also fails.  As this Court held, defendants did not misappropriate any information from Archegos because Archegos was fully aware of defendants' trading.  (Op. 15.)  Plaintiffs repeat their non-particularized assertions that defendants tipped preferred hedge funds, but they still do not allege any "specific sales connected to [any] tips, [or] the circumstances of [any] tips themselves."  (Op. 13, n. 5.)  As this Court recognized when it dismissed the prior complaints, plaintiffs' allegations about government investigations into block trading fall far short of alleging that defendants tipped any third party as to any supposed MNPI received from Archegos.  (*Id.*)  Plaintiffs' new allegations on this front—which consist of references to unspecific media reports coupled with conjecture— still fail to supply the particularized, plausible factual basis required for securities fraud claims.

Plaintiffs' claims fail for additional, independent reasons as well.  The amended complaints still do not allege facts supporting a strong inference of scienter, and their failure to plead a violation of Section 10(b) similarly dooms their Section 20A and Section 20(a) claims.  Finally, plaintiffs still cannot allege any contemporaneous trading by the lead plaintiffs in the *Felix* and *Scully* actions as required under Section 20A.

Since it is plain that further amendment cannot cure the deficiencies undermining plaintiffs' theories, the Court should dismiss the amended complaints with prejudice.

## BACKGROUND

Plaintiffs allege that they purchased shares in seven different issuers from March 22 to March 29, 2021 (the "Class Period") and suffered losses when prices declined.  (¶¶ 2, 24, 188.)[2]

### A.  Archegos and its Transactions with Defendants

Archegos is allegedly the "family office" of trader Sung Kook (Bill) Hwang.  (¶¶ 27, 33.) Archegos allegedly engaged in margin trading and total return swaps with several counterparties, including defendants.  (¶¶ 25-26, 37-54.)  Margin lenders extend credit in exchange for pledges of marketable securities or cash in a borrower's account.  (¶¶ 49-54.)  Archegos's margin lenders could make "margin calls," i.e., require it to pledge additional capital if the value of the assets securing its loans declined.  (¶¶ 9, 52, 135, 147.)  Failure to satisfy a margin call may constitute an event of default and entitle the lender to sell the securities pledged as collateral.  (¶ 154.)

Archegos also allegedly entered into swaps with various counterparties, including defendants.  (¶ 47.)  A swap is a derivative contract that enables a party (here, Archegos) to gain synthetic long exposure to a stock without actually buying it.  (¶ 40.)  The parties to the swap agree that if the price of the referenced security goes up, the long party receives the increase in value; if the price falls, the long party must pay its counterparty to make up for the decline.  (*Id.*) The long party may then be required to post cash or other collateral, also known as "margin." (*Id.*)  A failure to post margin may constitute a default and entitle the counterparty to terminate the swap.  (¶ 154.)  Plaintiffs allege that, in keeping with industry standards, defendants hedged

---

[2] As alleged in paragraph 2 of each amended complaint, the seven companies are Gaotu Techedu Inc., Vipshop Holdings Ltd., Tencent Music Entertainment Group, ViacomCBS Inc., IQIYI Inc., Baidu Inc. and Discovery Inc. The complaints' well-pled factual allegations are assumed to be true solely for purposes of this motion. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

their swaps with Archegos by purchasing the referenced stock in an amount "mirroring" the swap, so as to be "market neutral"—i.e., so the amount they would owe Archegos if the price rose would be covered by the increased value of the stock that they held.  (¶¶ 41-42, 123, 261.)  The alleged total amount of actual stock (or collateral) that Archegos owned amounted to 5% of the outstanding stock for each issuer, at most.  (¶ 94.)  The remaining Archegos-related shares were hedges held by Archegos's counterparties.  (¶¶ 94, 123.)

Plaintiffs generally allege that parties to swap and/or margin lending agreements will typically acquire certain information from their counterparties, such as information about a client's liquidity and exposures.  (¶¶ 59-60.)  As to Archegos's swap and/or margin lending agreements with defendants, however, plaintiffs fail to allege any details about what information Archegos supposedly provided, when, or to whom.  Plaintiffs instead assert that defendants allegedly received unspecified information "[i]n the course of providing . . . services, and through their respective . . . agreement[s] and contractual relationship with Archegos."  (¶ 117.)  Each defendant allegedly knew what positions Archegos held with it individually (¶ 125), but as plaintiffs acknowledge, defendants "may not have known the exact amount of Archegos's aggregate positions" (¶ 133) across the many counterparties with which it dealt.

Trying to cure the defects with their tipper/tippee theory that the Court identified in its prior ruling, plaintiffs attempt to characterize Archegos as an "insider" of the issuers because of the large positions it held, asserting that this status gave rise to duties to refrain from disclosing confidential information about the issuers.  (¶¶ 5-6; 81-84.)  Plaintiffs also newly allege that the unspecified information that defendants received from Archegos throughout their commercial relationship was MNPI.  (¶ 117.)  But as alleged in the amended complaints, this information was simply that (i) each defendant knew that Archegos held large swap positions with it, (ii) as

those positions got larger, each defendant "increased margin requirements and similar terms," and (iii) when Archegos' positions moved against it, defendants made "escalating margin calls." (¶ 118.) Although plaintiffs assert—in purely conclusory terms—that defendants also knew that Archegos was seeking to evade SEC reporting rules and was engaged in manipulative trading (*id.*), the amended complaints fail to support these allegations with any concrete facts. Instead, the amended complaints quote liberally from an internal investigation report prepared for a *different counterparty* (Credit Suisse) having nothing to do with defendants, and simply assume that defendants must have reached similar conclusions. (¶¶ 5, 119, 125, 127-29, 133-38, 152.)

The amended complaints fail (as before) to allege that Archegos received any information from the issuers, or that it owed them any fiduciary or other special duty of trust and confidence. Instead, plaintiffs assert in conclusory fashion that Archegos's large swap positions made it an "insider" of the issuers and subjected it to trading and non-disclosure obligations. (¶¶ 5-6; 81-84.) But plaintiffs do not suggest that Archegos did (or could do) anything that typically makes an "insider" an "insider," such as voting shares of stock or controlling the issuers' decisions. Rather, plaintiffs admit that the issuers did not know of Archegos's swap positions (¶ 100), and they do not allege that anyone from the issuers ever interacted with Archegos.

### B. In March 2021, After Its Positions Fall in Value, Archegos Defaults and Defendants Exercise their Contractual Remedies

As of March 2021, Archegos allegedly had acquired "highly concentrated" exposures to the stock prices of a small number of companies. (¶¶ 81-86.) Early in the week of March 22, 2021, the price of some of the stocks fell sharply. (¶¶ 142-45.) Archegos's positions declined by billions of dollars, which prompted margin calls from its counterparties to cover the losses. (¶¶ 147-48.) Archegos at first managed to post additional collateral, but on March 24, following additional stock price declines, it allegedly told each defendant that it could not satisfy further

margin calls expected on March 25.  (¶¶ 148, 150.)  Although Archegos allegedly sold some of its positions via block trades arranged by defendants on March 25 to try to meet its margin calls (¶ 151), Archegos remained unable to satisfy them, and that night, Archegos allegedly organized a call with defendants and other counterparties "in an attempt to thwart a large scale liquidation." (¶ 153.)  According to the amended complaints, during that call Archegos revealed to these counterparties that its gross exposure exceeded its capital by billions of dollars.  (*Id.*)  Archegos allegedly asked defendants and its other counterparties to "agree not to declare Archegos in default while it wound down its positions in an orderly manner."  (*Id.*)  Plaintiffs allege that Archegos's changing financial position during the week of March 22 and the contents of the March 25 call were part of the MNPI that Archegos provided.  (¶¶ 158-59.)

Plaintiffs allege that between the evening of March 25 and morning of March 26, several of Archegos's key margin lenders and swap counterparties, including defendants, "triggered events of default or early termination rights against Archegos."  (¶¶ 155, 180.)  Defendants thereafter sold "very large amounts of the Issuers' stock, both their proprietary hedged shares and Archegos's collateral." (¶¶ 155, 181-87.)  According to plaintiffs, discussions about "the possibility of a managed liquidation" continued into the weekend.  (¶ 156.)  Plaintiffs allege that on March 27, internal counsel for defendants and other counterparties "read a script making clear that none of them were permitted to disclose their specific Archegos related positions."  (*Id.*)  This is the only restriction purportedly agreed to during the calls.  Plaintiffs allege that Morgan Stanley continued to sell shares in the issuers' stock on March 28 and March 29.  (¶¶ 186-87.)

## C.  Aftermath of Archegos's Collapse

In 2022, the U.S. Department of Justice indicted Hwang and other Archegos executives, some of whom have pleaded guilty (¶ 251), and the U.S. Securities and Exchange Commission and U.S. Commodity Futures Trading Commission filed civil complaints against Archegos,

Hwang, and others.  (¶ 252.)  The indictment and complaints in these proceedings (which plaintiffs reference extensively) allege that Archegos engaged in a manipulative scheme to dominate trading in the issuers' stocks, and that Archegos used swaps to circumvent reporting obligations under Section 13 of the Exchange Act.  (¶¶ 251-55.)  Plaintiffs have notably removed language from the prior complaints alleging that Archegos repeatedly gave its counterparties, including defendants, false or incomplete information and took steps to mislead them. Nevertheless, the DOJ's indictment and the SEC's and CTFC's complaints—which were the source of plaintiffs' allegations—allege exactly that.[3]

### D.  The Court's Dismissal Opinion and Order and the Second Amended Complaints

On March 31, 2023, the Court granted defendants' motions to dismiss the prior complaints in their entirety.  In rejecting plaintiffs' tippee theory, the Court held that the complaints failed to allege any personal benefit Archegos received through its alleged "tipping," or that Archegos expected defendants to trade on the information.  (Op. 17-18.)  In rejecting plaintiffs' misappropriation theory, the Court declined to credit plaintiffs' "vague assertion" that defendants tipped hedge fund clients, as plaintiffs "point[ed] to no specific sales connected with these tips, nor the circumstances of the tips themselves."  (Op. 13, n.5.)  The Court further held that, even assuming defendants owed a fiduciary duty to Archegos, plaintiffs failed to allege any trades executed by defendants in breach of any such duty, defeating a claim of misappropriation. (Op. 12-15.)  Finally, given its conclusion that plaintiffs failed to state a claim for a primary

---

[3] *See* Op. 7; *see also* DOJ Indictment ¶ 47, *United States v. Hwang*, No. 1:22-cr-00240-AKH (S.D.N.Y. Apr. 25, 2022), ECF 1 (noting that Archegos "systematically misled the Counterparties in order to obtain additional trading capacity and margin lending"); SEC Compl. ¶ 94, *SEC v. Hwang*, No. 1:22-cv-03402 (S.D.N.Y. Apr. 27, 2022), ECF 1 (alleging that Archegos "gave materially false information to Counterparties, or omitted material information, regarding the concentration and liquidity of its portfolio"); CFTC Compl. ¶ 47, *CFTC v. Archegos Cap. Mgmt., LP*, No. 1:22-cv-03401 (S.D.N.Y. Apr. 27, 2022), ECF 1 (alleging that, "[r]ather than provide truthful information," Archegos "repeatedly misled Swap Counterparties about [its] aggregate positions").  This Court may refer to these filings because plaintiffs "relie[d]" on them in drafting and they are "integral to the amended complaint[s.]"  *See, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).

violation of the Exchange Act, the Court dismissed the Section 20A and 20(a) claims.  (Op. 19.)

Plaintiffs' fundamentally flawed allegations have not changed.  Plaintiffs attempt to cure the prior complaints' defects by asserting that, prior to its collapse, Archegos's relationship with defendants reflected a quid pro quo (¶ 8), and that Archegos benefitted or anticipated benefiting from purported financial, reputational, and relationship benefits of trading with defendants. (¶¶ 159-65, 200.)  But these are mere labels and conclusions, unsupported by any well-pled, particularized factual allegations.  The amended complaints allege no "personal benefit" to Archegos in connection with any alleged trading during the week of March 22.  (¶¶ 159-65.) Nor do plaintiffs allege with particularity any MNPI that was shared prior to March 25.  With respect to the alleged MNPI provided on March 25—i.e., Archegos's own liquidity problem— plaintiffs allege that Archegos should have expected defendants to trade on that information (¶10), but the complaints make clear that Archegos shared the information with defendants expressly to induce them *not* to trade.  (¶¶ 9-10.)

As to plaintiffs' conclusory block trading allegations, the amended complaints cite more of the same type of generalized media reports as before.  (¶¶ 71-78, 209-14.)  The new references to the rise in trading volume and drop in price for certain issuer shares on March 24-25 (¶¶ 205-06) similarly have no connection to any tipping and may in any event be explained by plaintiffs' own allegations that Archegos "directed" defendants to trade "hundreds of millions of dollars" on those days.  (¶¶ 146, 151.)  Plaintiffs again fail to allege any trades that were not disclosed to Archegos, instead claiming that defendants never disclosed to Archegos the "full extent" of their hedges.  (¶ 215.)  This latest allegation is not only conclusory, but again contradicted by plaintiffs' own allegations that Archegos's strategy "depended on" defendants' hedges, which "mirror[ed]" the size of Archegos's swaps.  (¶¶ 41, 45, 92, 123, 167.)

**ARGUMENT**

The amended complaints fail to cure the deficiencies previously identified by the Court and do not plead a claim for insider trading under any theory, let alone under the heightened pleading standards required here.  (Op. at 9-10, 15, 18.)  Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") require plaintiffs to plead the alleged deceptive conduct with particularity, including "all facts" supporting allegations made on information and belief. 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b).  This includes "the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and "facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs fail to meet this standard.

## I.   PLAINTIFFS FAIL TO PLEAD INSIDER TRADING UNDER ANY THEORY

### A.   Plaintiffs Fail to Allege a Tippee Claim

To plead tippee liability, a plaintiff must allege that a corporate insider entrusted with a fiduciary duty breached that duty by improperly disclosing the corporation's confidential information to a tippee in exchange for a personal benefit.  (*See* Op. 16 (citing *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 456 (S.D.N.Y. 2015)).  A plaintiff must also show that "the tippee kn[ew] the information was disclosed [to it] in breach of the tipper's duty, and [that] the tippee" traded on the information "in disregard of that knowledge."  *Salman v. United States*, 580 U.S. 39, 42 (2016); (Op. 9-10).  The "logic" of the personal benefit test is that "[a] firm's confidential information belongs to the firm itself, and an insider entrusted with it has a fiduciary duty to use it only for firm purposes."  *United States v. Martoma*, 894 F.3d 64, 73 (2d Cir. 2017).  The amended complaints are missing *all* of these essential elements.

1.   *Plaintiffs fail to allege that Archegos was an insider that possessed or shared any confidential information belonging to the issuers.*

Plaintiffs' tippee theory simply does not comport with insider trading law.  At the outset,

plaintiffs' claims fail because the information that Archegos purportedly shared with defendants was *not sourced from the issuers at all*, let alone in the context of a special confidential relationship.  *See Chiarella v. United States*, 445 U.S. 222, 231 (1980) (holding no liability where defendant "received no confidential information from the target company"); *Sawant v. Ramsey*, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (shareholder was not an insider where there was no evidence that he "received access to any confidential information").

Archegos cannot have breached a duty to the original source of the alleged MNPI because the original source *was Archegos itself.  See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 13–14 (2d Cir. 1983) (no insider trading claim where "the complaint contains no factual assertions that [defendants] received *any* information" from target).  As plaintiffs describe it, the issuers *never had* any of the alleged MNPI: Archegos's swaps with each defendant, the size of those swaps, the margin requirements, and the costs to Archegos are the material terms of Archegos's *own* arm's-length trading with defendants.  This is not the "inside corporate information" that purported tippers are prohibited from "secretly using . . . for their personal advantage."  *Salman*, 580 U.S. at 41; *see also Dirks v. SEC*, 463 U.S. 646, 659 (1983) (forbidding insiders from "personally using *undisclosed corporate information* to their advantage" or giving it "to an outsider for the same improper purpose of exploiting the information for their personal gain).  Nor does MNPI "belong" to an issuer simply because the information relates to the issuer or may affect its stock price.  Defendants are not aware of any case in which the original source or owner of the confidential information was deemed a tipper for sharing its own information for its own corporate purposes.  To the contrary, transmitting information for a "corporate purpose" or based on a "legitimate business justification"—here, transacting in swaps and trying to delay a default—does not violate insider trading laws, even if

the information is used for trading.  *See Martoma*, 894 F.3d at 79; *see also Dirks*, 463 U.S. at

663.  Under plaintiffs' theory, any time a dealer trades securities with a counterparty, it risks

insider trading charges merely by obtaining information from that entity as required by contract

or as necessary to complete the transaction.  That is not the law.  *United States v. O'Hagan*, 521

U.S. 642, 656 (1997) (insider trading laws "target[] information of a sort that [traders] ordinarily

capitalize upon to gain no-risk profits through the purchase or sale of securities").

Additionally, although this Court previously deemed "Archegos's insider status to [be]

'plausible'" (Op. 17), it does not follow that Archegos could "tip" defendants with information

that it did not obtain from, and was unknown to, the issuers.  The "duty [to disclose] arises from

the relationship between parties . . .  and not merely from one's ability to acquire information

because of his position in the market."  *Dirks*, 463 U.S. at 657–58 (citing *Chiarella*, 445 U.S. at

232–33 n. 14).  "The basis for recognizing [the] fiduciary duty [of a temporary insider] is not

simply that such persons acquired nonpublic corporate information, but rather *that they have*

*entered into a special confidential relationship* [*with the corporation*] *and are given access to*

*information* solely for corporate purposes."  *Dirks*, 463 U.S. at 655 n. 14.  "For such a duty to be

imposed, however, *the corporation must expect the outsider to keep the disclosed . . .*

*information confidential*, and the relationship at least must imply such a duty."  *Id.*

Courts have accordingly considered shareholders to be insiders when they have a special

relationship with a corporation that affords access to the corporation's confidential information

or control over the corporation's affairs.  *See, e.g.*, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370

n. 5 (2d Cir. 2014) (controlling shareholders are insiders because "they have the same sort of

access to information . . . as the typical officer and director");  *Sawant*, 742 F. Supp. 2d at 238

(shareholder not an insider where he "did not participate in the development, marketing or

business planning," was not a consultant or advisor, and only conversed with the company in his

capacity as shareholder); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186,

at *12 (N.D. Ill. Jan. 6, 2020) ("[M]inority shareholders do not acquire insider status, even if

they have a member on the Board, unless they exercise control over the corporation's affairs.").

Archegos is not alleged to have had *any* relationship with the issuers nor received any

confidential information from them.  To the contrary, Archegos allegedly concealed its holdings,

and "no one knew" that Archegos purportedly held "massive amounts of stock in" the issuers.

(¶ 100.)  Thus, the issuers had *no possible expectation* of confidentiality from Archegos.  *Dirks*,

463 U.S. at 655 n.14.  Nor did Archegos ever allegedly exercise the type of control over

corporate affairs associated with controlling shareholders.  *See, e.g.*, *Gruber v. Gilbertson*, 2021

WL 2482109, *14 (S.D.N.Y. June 17, 2021) (finding that shareholders "possessed power over

corporate affairs" where they "were part of the day-to-day business," involved in appointing

officers, and "directed financial decisions").  Archegos had no alleged contact with the issuers,

much less influence over their corporate affairs.  Nor does Archegos's alleged manipulation of

stock prices, in itself, provide any basis for deeming Archegos an insider.  *See DeMarco v.*

*Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 122, 127 (S.D.N.Y. 2004) (alleged pump and

dump scheme did not qualify as an insider trading violation despite defendants' propping up

prices by misleading the public);  *Feldman v. Simkins Indus., Inc.*, 679 F.2d 1299, 1303–04 (9th

Cir. 1982) (allegations that shareholder's statements artificially inflated stock price were

insufficient to show that shareholder was an insider with a duty to abstain or disclose); *Dirks,*

463 U.S. at 657–58.[4]  An alleged ability to impact stock prices by trading in the secondary

---

[4] Plaintiffs' assertions that Archegos was obligated to disclose its purported beneficial ownership under Sections 13 and 16 of the Exchange Act (*see* ¶¶ 93, 196-97) "does not, in and of itself, establish that Archegos had a more general duty of confidentiality" (Op. 16-17, n. 6).

market does not confer insider status on a shareholder because it is wholly divorced from the essential element of an insider trading violation: "the existence of a relationship affording access to insider information intended to be available only for a corporate purpose." *Dirks*, 463 U.S. at 653. Allegations about the size of Archegos's positions thus do not substitute for allegations of actual insider status and cannot support plaintiffs' tippee claims.

       2.     *Plaintiffs fail to plead the remaining elements of a tippee claim.*

Even assuming that plaintiffs have plausibly alleged that Archegos was an insider by virtue of its swap exposures to (and trading in) the issuers' stock (*see* ¶ 196-97; Op. 17), plaintiffs' tippee theory still fails for three additional reasons. The amended complaints lack facts demonstrating (1) that Archegos sought any personal benefit in sharing the purported MNPI with defendants so that they could trade on it; (2) the particular confidential information that Archegos purportedly shared (or that defendants knew); and (3) that defendants *knew* Archegos was breaching any duty by sharing its own information.

***First***, plaintiffs again fail to plead that Archegos sought a personal benefit by sharing MNPI with defendants with the expectation that defendants would trade on it. (Op. 17-18); *Martoma*, 894 F.3d at 68, 79 (explaining that personal benefit requires evidence suggesting a quid pro quo between the tipper and tippee, or a tipper's intention to benefit the tippee); *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019) ("The critical question regards the tipper's purpose: did the tipper share the [MNPI with the expectation] that the tippee use the information to improperly trade in securities?"). Rather, plaintiffs continue to "allege the exact opposite" (Op. 18): that Archegos shared information "in an attempt to thwart a large scale liquidation" (¶ 153), in the hopes that its counterparties would "*refrain* from trading, [and] opt for a managed liquidation." (Op. 18; ¶¶ 17, 154.) Plaintiffs' allegations present a backwards theory of insider trading: Archegos sought to benefit, *not* from defendants' trading, but by *preventing* the trading

14

that Archegos otherwise expected defendants to engage in absent receipt of the alleged MNPI. (¶¶ 9-10.)  Nor is there any suggestion of quid pro quo.  According to plaintiffs, Archegos's goals and defendants' goals were entirely at odds, with Archegos only benefitting if defendants did *not* trade (*id.*), and no alleged benefits to defendants from forbearing.  (¶ 185.)

Straining to cure the deficiencies identified by the Court, plaintiffs allege that Archegos received the benefits of "pecuniary [gains]. . . in connection with its swap investments, block trading, margin lending, [and] trading capacity" (¶ 200); "sustaining [its] market manipulation scheme" (*id.*); "enhancing its connections to Defendants" (¶ 162); and "relational and reputational benefits" (¶ 287).   The concocted nature of this argument is reflected in the fundamental mismatch between the timing of these purported "benefits" to Archegos (prior to late March 2021) and the alleged trading that is the basis for plaintiffs' claims—the *only* purported unlawful trading was during the March 22-29 class period.[5]  (¶ 16.)  By that time, Archegos's relationship with defendants is not alleged to have offered any of these supposed benefits.  Plaintiffs offer no theory by which Archegos could have "tipped" defendants during the late-March period to enhance the parties' trading relationships or reap reputational and institutional advantages from having defendants as counterparties.  (¶¶ 160-64.)  In fact, plaintiffs allege just the opposite, i.e., that in late March, Archegos, knowing it was facing a liquidity crisis and inevitable defaults, was instead looking to *unwind* its transactions.  (¶¶ 9-10.)

***Second***, plaintiffs fail to plead with particularity any purported MNPI Archegos shared with *defendants* (or that *defendants* knew) before March 25.  Plaintiffs allege that the MNPI here

---

[5] Plaintiffs do not allege the details of any trading or hedging done prior to March 22, much less that such trading was improper or based on MNPI received from Archegos.  Rather, they describe defendants' hedging activities as "[f]ollowing the industry standard." (¶ 41).  And the failure to allege any details about any trades is fatal to a tippee claim. *See Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 233 (S.D.N.Y. 1997) (insider trading allegations insufficient where complaint contained no "factual allegations regarding the date of any sale, the seller for any particular sale, the number of shares sold, or the price for those shares").

included: Archegos's "massive, highly leveraged and concentrated" aggregate positions; its

decision to "structure[e] its investments" as swaps to evade reporting requirements; and a

"dramatic[]" increase in the size of Archegos's positions "in the first quarter of 2021." (¶¶ 118,

122.) But these are "mere conclusory statements [that] are insufficient to state [a] claim," *Noto*

*v. 22nd Century Grp.*, 35 F.4th 95, 104 (2d Cir. 2022) (citing *Iqbal*, 556 U.S. at 678), and "[t]he

failure to provide any specific description of the alleged inside information or when it was

obtained is grounds in itself for dismissal under Fed. R. Civ. P. 9(b)." *Log On Am., Inc. v.*

*Promethean Asset Mgmt. LLC*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001) (cleaned up); *see also*

*Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 529 (S.D.N.Y. 2013) (dismissing tippee

claim that "only allege[d] a non-particularized claim" that MNPI was "consistently

communicated" to defendants).

      Plaintiffs cannot cure these deficiencies by invoking allegations attributable to entities

other than defendants. Plaintiffs' allegations that defendants knew of "numerous red flags

relating to the size, concentration, and liquidity of Archegos's portfolio" (¶ 5, 133-38); "that

Archegos had additional concentrated exposure to the same [issuers] across the street" (¶ 5, 125);

that Archegos "preferred swap positions for their 'anonymity'" (¶ 129); that "risk managers

should have spotted clues of undue risk" (¶ 119); and that Archegos had to "'carefully liquidate

positions in order not to tip the market'" (¶ 152) rely entirely on what *Credit Suisse*—a non-

defendant—purportedly knew.[6] But plaintiffs cannot survive on the speculative and conclusory

assertion that defendants also had the same "knowledge" as Credit Suisse. *Cf. Orlan v.*

---

[6] Similarly, plaintiffs have conspicuously removed that *Credit Suisse* was the counterparty that gave up a contractual provision requiring Archegos to represent that it did not beneficially own more than 10% of outstanding shares in an issuer, and instead try to obfuscate this fact by replacing "Credit Suisse" with "certain prime brokers." *Compare* Second Am. Class Action Compl. ¶ 5 *with* First Am. Class Action Compl. ¶ 5, *Tan v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08413, ECF No. 54. *See Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings. Accordingly, the Court may consider them on a motion to dismiss under Rule 12(b)(6).").

*Spongetech Delivery Sys., Inc., Sec. Litig.*, 2012 WL 1067975, at *11 (E.D.N.Y. Mar. 29, 2012) (group pleading doctrine "does not permit plaintiffs to presume the state of mind of . . . defendants").  Such allegations do not meet general pleading requirements, let alone the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See Iqbal*, 556 U.S. at 678 (a claim must allow "the court to draw the reasonable inference that the *defendant* is liable for the misconduct alleged"); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("General allegations not tied to the defendants or resting upon speculation are insufficient.").  And they certainly do not square with the government pleadings, alleging that Archegos misled its counterparties, including defendants.

     ***Third,*** plaintiffs fail to adequately allege that defendants assumed any derivative duty from Archegos to disclose or abstain from trading.  Even accepting that Archegos had MNPI from the issuers, and further accepting that Archegos provided that information in breach of its own duty to the issuers, plaintiffs still fail to allege any facts to support an inference that *defendants knew* Archegos had done so.  *Salman*, 580 U.S. at 42.  While plaintiffs make various allegations about Archegos's aggregate position sizes and market manipulation scheme (¶¶ 107-16), they fail to allege that defendants knew this information.  The amended complaints themselves belie such a conclusion, as plaintiffs affirmatively allege that defendants "may not have known the exact amount of Archegos's aggregate positions" with other dealers.  (¶ 133).

     Even on March 25, 2021—the date plaintiffs allege defendants obtained MNPI from Archegos—plaintiffs do not allege that defendants learned any information from which they might have been able to glean that Archegos had used swaps (a common and legal investment instrument) as a means of avoiding reporting its positions and engaging in market manipulation. Rather, plaintiffs merely allege that defendants learned that Archegos had less than $10 billion of

equity to $120 billion in aggregate exposure.  (¶ 153.)  Indeed, plaintiffs concede that on the

March 27 call, the alleged script "ma[de] clear that none of [the counterparties] were permitted to

disclose their specific Archegos related positions."  (¶ 156.)

Finally, as this Court recognized, the government proceedings against Archegos (which

plaintiffs source extensively) explain that Archegos "deliberately misled" its counterparties

(which plaintiffs now conveniently omit).[7]  (Op. 7; *see also* DOJ Indictment ¶ 44-49 (alleging

that Archegos "declined" to provide its counterparties information about "the names or precise

sizes of its overall portfolio" and made misrepresentations "directly relevant to" their ability to

assess "the risk that ultimately materialized").)  This is irreconcilable with any argument that

defendants knew Archegos was doing anything but providing information about itself for its own

legitimate corporate purposes (i.e., transacting in swaps and managing its liquidity crisis).

### B.    Plaintiffs' Misappropriation Theory Fails

Under the "misappropriation theory" of insider trading, a person who is not an insider

may commit insider trading by making use of confidential information "in breach of a duty of

loyalty and confidentiality" to a third party who supplied it, thereby "defraud[ing] the principal

of the exclusive use of the information." *O'Hagan*, 521 U.S. at 652.

Plaintiffs' alternative theory—that defendants misappropriated Archegos's own

confidential information during the week of March 21, 2021—was previously dismissed by this

Court because plaintiffs had failed to allege even "a single trade executed by Defendants where

---

[7] For example, paragraph 4 of the amended complaints selectively quotes from paragraph 1 of the DOJ Indictment, omitting the portion that identifies Archegos's counterparties as *victims* of Archegos's fraud.  The amended complaints extensively lift language from the DOJ Indictment and the SEC's and CFTC's civil complaints throughout, often without attribution: *see*, *e.g.*, ¶¶ 27 (SEC Compl. ¶ 15), 31-32 (CFTC Compl. ¶¶ 21-22), 34 (DOJ Indictment ¶ 9), 36 (DOJ Indictment ¶ 10), 88-89 (CFTC Compl. ¶ 39), 102 (SEC Compl. ¶ 61), 106a–f (DOJ Indictment ¶¶ 28(c), 28(c)(ii)–(iv); SEC Compl. ¶¶ 64-66), 126 (SEC Compl. ¶¶ 142-44).  And many of the charts and tables in the amended complaints are likewise copied from the government actions: *see* ¶¶ 82 (SEC Compl. ¶ 55), 84 (DOJ Indictment ¶ 26), 110-12 (SEC Compl. ¶¶ 71-73), 115 (DOJ Indictment ¶ 31).

they did not *disclose the trade to Archegos*."  (Op. 13 (emphasis in original).)  Even if this Court had ruled that plaintiffs could replead their misappropriation claim, plaintiffs' amended complaints fail to cure this fatal defect with their misappropriation theory.[8]

The amended complaints contain no new allegations supporting misappropriation.  As before, plaintiffs allege that defendants misappropriated Archegos's confidential information by tipping favored clients about upcoming block sales on March 24 and 25, 2021.  (¶ 206.) Plaintiffs rely predominantly on news articles about unrelated government investigations into block trading, which mention neither Archegos nor the issuers relevant to these cases.  (¶¶ 15, 70-77, 207-14, 248-50.)  This Court rejected nearly identical allegations as a basis for plaintiffs' prior claims, determining that plaintiffs had pointed to "no specific sales connected to these tips, nor the circumstances of the tips themselves," and so the allegations had no "particular plausible basis in the [c]omplaint[s]."  (Op. 13-14, n. 5 (citing *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008).)  Citing more of the same gets plaintiffs no further.

The only new allegations in support of this theory are that (i) trading volumes increased for the seven issuers on March 24, 2021, relative to their first quarter 2021 averages; and (ii) the stock price of one of the seven issuers (Discovery) allegedly declined before Morgan Stanley allegedly priced block trades involving that stock on March 24 and 25, which, according to plaintiffs' "information and belief," are "tell-tale" signs of front-running.  (¶¶ 205-06.)

Even if true, this is consistent with plaintiffs' *own* allegation that Archegos itself "directed" defendants and other counterparties to sell "hundreds of millions of dollars of" its "concentrated positions" on those same days.  (¶ 146.)  The Supreme Court has made clear that

---

[8] The Court only granted plaintiffs leave to amend their tippee theory (*see* Op. 15, 18.)  The Court may dismiss claims in the amended complaints that exceed the scope of plaintiffs' leave to amend, *see Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012), or strike those claims from the amended complaints, *see Starostenko v. UBS AG*, 2022 WL 1082533, at *2–3 (S.D.N.Y. Apr. 7, 2022).

allegations that are just as consistent with lawful conduct do not satisfy even the basic plausibility standard of Rule 8(a). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (allegations of parallel conduct in antitrust context, without more, does not suggest unlawful conspiracy). Here, sales that Archegos directed obviously involve no misappropriation of its information and cannot be a "deceptive device," as required for a Section 10(b) violation. *See O'Hagan*, 521 U.S. at 655. Furthermore, it is a significant and entirely conclusory leap to attribute any such observed price movements to defendants, and even more so to any *improper* trading by defendants. Plaintiffs' conclusory allegation that this exact same trading "was reflective of front-running" (¶ 205) fails to establish the "particular plausible basis" that this Court found missing in the prior complaints. (Op. 13-14, n.5.)   And it certainly does not satisfy the heightened particularity requirements with which a purported insider trading scheme must be alleged. *See In re FBR Inc. Secs. Litig.*, 544 F. Supp. 2d at 354; *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan*, 553 F.3d 187, 196 (2d Cir. 2009). And as limited as these allegations are with respect to Morgan Stanley, they are non-existent as to Goldman Sachs, requiring dismissal under any standard.

In a last-ditch effort to rescue their misappropriation allegations, plaintiffs vaguely assert that defendants "did not disclose to Archegos the full extent of their massive unloading of proprietary hedged shares" in connection with their alleged block trades, because defendants did not inform Archegos of "their precise amount of proprietary shares or their precise hedging strategy." (¶ 215.) This conclusory allegation is unsupported by factual allegations as to how defendants' alleged trading of hedges actually differed from the trades Archegos consented to or was given notice of. And it is inconsistent with other allegations that Archegos's manipulative strategy "depended on" its understanding that defendants would hedge against its swap positions

by "purchasing the issuer stock referenced" in those positions, and that counterparties "will hedge [their] exposure . . . by acquiring the amount of shares the [swap] covers."  (¶¶ 45, 167; *see also* ¶¶ 41, 92, 123.)  Absent particularized details of trading by defendants that was not disclosed to Archegos, the Court should once again decline to credit plaintiffs' vague assertions that defendants traded in breach of any duty owed to Archegos.  (Op. 13–14, n.5.)

Finally, while the Court did not previously reach the issue of whether defendants owed a duty of confidentiality to Archegos (*see* Op. 11-12), plaintiffs' failure to establish any such duty dooms their argument that a duty was breached as a result of trading that was disclosed to Archegos "imprecisely."  *See, e.g.*, *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372 (S.D.N.Y. 2011) ("Generally, commercial transactions do not create fiduciary obligations, absent express language in the contract, or a prolonged prior course of dealings between the parties establishing the fiduciary relationship.").[9]

## II.  PLAINTIFFS DO NOT ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs' Section 10(b) claims should also be dismissed because they fail to plead scienter, a necessary element of every Section 10(b) claim.  Scienter encompasses "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976)).  Under the PSLRA, plaintiffs must plead a "strong inference" of scienter, which requires the court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 324.  The inference that a defendant acted with scienter

---

[9] Plaintiffs' alternate theories for the source of this duty (*see* ¶¶ 217-19) are equally deficient.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) ("[I]n the context of an ordinary broker-client relationship, the broker owes no fiduciary duty to the purchaser of the security."); *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1311 (2d Cir. 2002) (courts "have sensibly declined to infer legal duties from internal 'house rules' or industry norms that advocate greater diligence than otherwise required by law"); *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (no "unilateral[]" fiduciary duty created by "entrusting a person with confidential information").

must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* To plead scienter with particularity, "a complaint must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (internal quotation marks and citation omitted). In the insider trading context, plaintiffs must allege with particularity that "at the moment of tipping or trading," the defendant "kn[e]w or [was] reckless in not knowing that the conduct was deceptive." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). For a tippee theory, this requires factual allegations supporting the conclusion that the tippee was aware that it was trading based on information provided in breach of the tipper's duty. *See id.*; s*upra* at 10.

The inference of scienter that plaintiffs urge the Court to draw fails this standard. The amended complaints provide no basis to infer that defendants knew Archegos was breaching any duty to the issuers by sharing its own information with them, or that defendants were exploiting information in breach of any duty to Archegos. *See supra* Part I; *Obus*, 693 F.3d at 286 (trader "must understand that [trading on] the information would be violating a confidence."). If anything, plaintiffs' amended complaints and the sources they borrow from heavily make clear that defendants themselves were misled by Archegos. *Supra* at 8, 18; *see, e.g.*, *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (no scienter where "the more compelling inference" was deception of Pricewaterhouse); *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 481 (S.D.N.Y. 2013) (no scienter where allegations "only reinforce the inference that the AC Defendants were themselves victims of the fraud").

Nor do plaintiffs' bald assertions that defendants "possessed MNPI at the time they engaged in the stock sales described herein," and that the alleged "possession of this knowledge

while trading demonstrates their scienter" help them. (¶ 257.)  Such "bare-bones allegations are insufficient to raise a strong inference of scienter."  *See Gordon*, 962 F. Supp. 2d at 531 (dismissing insider trading claim for no scienter).  Plaintiffs' argument wrongly equates trading on MNPI with scienter, a conclusion that would render the scienter element meaningless.

Far from pleading a strong inference of scienter, the alleged facts demonstrate a more plausible, non-fraudulent explanation for defendants' conduct:  they hedged their swaps with Archegos as was "industry standard" for maintaining a "market neutral" risk position, and then, in response to Archegos's defaults, they exercised their standard contractual remedies to terminate their swaps and reduce their exposures—just as they would do in response to any other counterparty's default.  (¶¶ 41, 45-46, 92, 167.)  As this Court previously held, such allegations "suggest only that [the defendant] was taking legitimate business steps to protect its own credit position," which do not give rise to scienter as a matter of law.  *See Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 426 (S.D.N.Y. 2008) (dismissing claim against clearing broker for failure to allege manipulative trading or scienter), *aff'd in part, vacated in part on other grounds*, 716 F.3d 18 (2d Cir. 2013) *and* 527 F. App'x 89 (2d Cir. 2013) (affirming dismissal of clearing broker claims in full); *see also Ross v. Bolton*, 639 F. Supp. 323, 327 (S.D.N.Y. 1986) (trading "to reduce the amount owed" pursuant to "a loan of money under margin" does not reflect conscious misbehavior); *In re MRU Holdings Secs. Litig.*, 769 F. Supp. 2d 500, 517 (S.D.N.Y. 2011) (conclusory allegations regarding desire to obtain fees are insufficient to give rise to a strong inference of scienter).  Put another way, conduct undertaken to further ordinary business and profit motives does not support a strong inference of scienter.  *See, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor . . . does not support a strong inference of fraudulent

intent.").  Plaintiffs have not alleged anything more here.

### III.   THE SECTION 20A AND 20(a) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION AND ADDITIONAL REASONS

This Court previously dismissed plaintiffs' Section 20A and Section 20(a) claims because

plaintiffs failed to plead a predicate violation of Section 10(b) and Rule 10b-5.  (Op. 19.)  Once

again, plaintiffs' failure to plead a predicate violation is also fatal to their Section 20A claims

and Section 20(a) claims.  *See, e.g.*, *Bristol-Myers Squibb Co.*, 28 F.4th at 356.  Plaintiffs have

also failed to cure the other defects in these claims that were previously identified by this Court.

### A.   The Section 20A Claims in *Felix* and *Scully* Must Be Dismissed Because Plaintiffs Do Not Allege Contemporaneous Trading

Just as in the original complaints, the Section 20A claims asserted by the lead plaintiffs in

the *Felix* (IQIYI) and *Scully* (Baidu) actions should be dismissed because those plaintiffs have

not alleged that they traded contemporaneously.  (Op. 18-20.)  The lead plaintiffs in each case

allegedly purchased their shares on March 23 and 24.[10]  This Court previously held that these

alleged purchases were insufficient to support a Section 20A claim because they occurred *before*

defendants purportedly traded on Archegos's confidential information.  (Op. 19-20; *see also In*

*re Take-Two Interactive Secs. Litig.*, 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008); *O'Connor*

*& Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803 (S.D.N.Y. 1983).)

Plaintiffs try to solve their contemporaneous trading problem by inventing purported new

sales of defendants' hedges on March 24 (¶ 294), but the amended complaints do not actually

allege that those sales were made in breach of a duty of confidentiality to Archegos.  Instead, the

amended complaints allege that Archegos "directed" its counterparties to sell "hundreds of

---

[10] 2d Am. Compl. ¶ 24, ECF 56 & PSLRA Cert., ECF 26-2, *Felix*, No. 1:21-cv-10286 (bought on 3/24/2021); 2d Am. Compl. ¶ 24, ECF 51 & PSLRA Cert., ECF 25-2, 25-4, *Scully*, No. 1:21-cv-10791 (bought on 3/23-24/2021).

millions of dollars" worth of its positions throughout that day (¶ 146), and further "agree[d]" the following day (March 25) to have defendants "sell certain of its collateral in an attempt to raise sufficient cash to meet its margin calls." (¶¶ 151, 178.)

**B.      The Section 20(a) Claims Fail Because Plaintiffs Do Not Allege That Defendants Exercised Control Over Any Relevant Actor**

Plaintiffs' Section 20(a) claims independently fail because plaintiffs still have not alleged any control by defendants, as this Court previously held.  (Op. 20-21.)  To plead a control person claim, a plaintiff must allege that the defendants had the actual ability to control and, in fact, exercised control over the primary violators with respect to the conduct at issue.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 495–96 (S.D.N.Y. 2005) (dismissing Section 20(a) claim for alleging "boilerplate language" in place of factual allegations of control).  Just as with the prior complaints, plaintiffs fail to "connect their accusations in any meaningful way" to the handful of employees named in the amended complaints.  (Op. 21.)  Although plaintiffs now purport to identify individuals that they claim were involved in block trading or purported tipping of hedge funds (¶ 310), they concede that they cannot specifically link those alleged control persons to any trades here.  (*Id.*)  As a result, plaintiffs' 20(a) claims must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their motions to dismiss the second amended complaints with prejudice.

Dated: July 18, 2023

**DAVIS POLK & WARDWELL LLP**

By: /s/ *Charles S. Duggan*
Charles S. Duggan
Daniel J. Schwartz
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
charles.duggan@davispolk.com
daniel.schwartz@davispolk.com

*Counsel for Defendant Morgan Stanley*


**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By: /s/ *Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Michael Cinnamon
Mijin Kang
Olivia Everton
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
cboccuzzi@cgsh.com
mcinnamon@cgsh.com
mkang@cgsh.com
oeverton@cgsh.com

*Counsel for Defendant Goldman Sachs Group, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 18, 2022, the foregoing MEMORANDUM

OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE SECOND

AMENDED CLASS ACTION COMPLAINTS was electronically filed with the Clerk of Court

using the CM/ECF system that will send notification of such filing to all counsel of record.


By:     /s/ *Charles S. Duggan*
        Charles S. Duggan